Moll v. Telesector

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2021

(Argued:  January 18, 2022                    Decided:  February 28, 2024)

Docket No. 20-3599

_____

CINDY L. MOLL,

*Plaintiff-Counter-Defendant-Appellant*,

- v. -

TELESECTOR RESOURCES GROUP, INC., d/b/a Verizon Services Group,
a/k/a Verizon New York Inc.,

*Defendant-Counter-Claimant-Appellee*.[*]

_____

Before:  KEARSE, WALKER, and SULLIVAN, *Circuit Judges*.

Appeal from so much of a final judgment of the United States District Court

for the Western District of New York, William M. Skretny, *Judge*, as dismissed plaintiff's

---

[*]     The Clerk of Court is instructed to amend the official caption to conform with the
above.

action against her former employer, principally alleging gender-based discrimination in the terms and conditions of her employment, including hostile work environment, retaliatory transfer of her job site to a city some 160 miles away, and discriminatory or retaliatory termination of her employment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*; and alleging that plaintiff was paid less than her male co-workers for substantially similar work, in violation of Title VII and the Equal Pay Act, 29 U.S.C. § 206 *et seq.* Following proceedings after a remand from this Court in *Moll v. Telesector Resources Group, Inc.*, 760 F.3d 198 (2d Cir. 2014), the district court granted summary judgment dismissing the action, ruling principally that plaintiff failed to point to evidence sufficient to establish (a) an objectively hostile work environment, (b) an adverse employment action, or discriminatory or retaliatory intent, in the job site transfer, or (c) a clear causal connection between her gender or her protected activity and the termination of her employment; the court dismissed the claims of gender-based unequal pay on the ground that the pay differences were not based on gender. *See Moll v. Telesector Resources Group, Inc.*, No. 04-CV-805, 2020 WL 5593845 (W.D.N.Y. Sept. 18, 2020).

On appeal, plaintiff contends principally that the court erred in concluding as a matter of law that there was no adverse employment action or clear retaliatory motive in her job site transfer; and that the court's conclusions that her proffered evidence was

insufficient to show, *inter alia*, (A) an objectively hostile work environment, and (B) circumstances giving rise to an inference of (1) retaliation in the job site transfer, (2) discrimination or retaliation in the termination of her employment, and (3) unequal pay, failed to view the record in the light most favorable to her. We conclude that the record, viewed in the light most favorable to plaintiff in connection with the motion for summary judgment against her, presents genuine issues of material fact to be tried as to the claims of hostile work environment, retaliatory transfer, and discriminatory or retaliatory termination of employment; and that such issues also exist with respect to plaintiff's Equal Pay Act claim as to one of her identified comparators. We vacate the judgment to the extent that it dismissed these claims and remand for trial. Other aspects of the final judgment are affirmed or remain undisturbed.

Affirmed in part; vacated and remanded in part.

JOSEPHINE A. GRECO, Buffalo, New York (Greco Trapp, Buffalo, New York, on the brief), *for Plaintiff-Counter-Defendant-Appellant*.

JAMES S. URBAN, Pittsburgh, Pennsylvania (Jones Day, Pittsburgh, Pennsylvania, on the brief), *for Defendant-Counter-Claimant-Appellee*.

- 3 -

KEARSE, *Circuit Judge*:

Plaintiff Cindy L. Moll appeals from so much of a final judgment of the United States District Court for the Western District of New York, William M. Skretny, *Judge*, as dismissed her action against her former employer defendant Telesector Resources Group, Inc., d/b/a Verizon Services Group, an indirect subsidiary of Verizon Communications Inc. (collectively "Verizon" or "Verizon Business" or "the Company"), principally alleging gender-based discrimination in the terms and conditions of her employment, hostile work environment, retaliatory transfer of her job site to a city some 160 miles away, and discriminatory or retaliatory termination of her employment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"); and alleging that she was paid less than several of her male co-workers for substantially similar work, in violation of Title VII and the Equal Pay Act, 29 U.S.C. § 206 *et seq.* (or "EPA"). Following proceedings after a remand from this Court, *see Moll v. Telesector Resources Group, Inc.*, 760 F.3d 198 (2d Cir. 2014) ("*Moll III*"), the district court granted Verizon's motion for summary judgment, ruling principally that Moll failed to point to evidence sufficient to establish (a) an objectively hostile work environment, (b) an adverse employment action, or discriminatory or retaliatory intent, in the job site transfer, or (c) a clear causal connection between her gender or her protected activity and the termination of her employment; the court dismissed the

- 4 -

claims of gender-based unequal pay on the ground that the pay differences were not based on gender.

On appeal, Moll contends principally that the court erred in concluding as a matter of law that there was no adverse employment action or clear retaliatory motive in her job site transfer; and that the court's conclusions that her proffered evidence was insufficient to show, *inter alia*, (A) an objectively hostile work environment, and (B) circumstances giving rise to an inference of (1) retaliation in the job site transfer, (2) discrimination or retaliation in the termination of her employment, and (3) unequal pay, failed to view the record in the light most favorable to her. We conclude that the record, viewed in the light most favorable to Moll in connection with the motion for summary judgment against her, presents genuine issues of material fact to be tried as to the claims of hostile work environment, retaliatory transfer, and discriminatory or retaliatory termination of her employment; and that such issues also exist with respect to Moll's Equal Pay Act claim as to one of her identified comparators. We thus vacate the judgment to the extent that it summarily dismissed these claims and remand for trial. Other aspects of the final judgment are affirmed or remain undisturbed.

# I. BACKGROUND

Moll, who was employed by Verizon (or its predecessor or component entities) from 1990 until her termination in 2007, began, as a high school graduate, in the Company's Buffalo, New York, office in a clerical position. She earned an Associate's Degree in Business in 1999 and a Bachelor's Degree in Business in 2006. In 1997, she had been promoted to a sales-related role in the Company's enterprise solutions group, whose mission was to sell Verizon products and services to institutional customers, including businesses, governmental entities, healthcare facilities, and schools. Moll's position (called "Systems Analyst" until Verizon revised its titles in 1999) was "Sales Engineer" (or "SE").

The primary function of an SE was to assist a group's sales representative, titled a "Corporate Account Manager" (or "CAM"), in selling Verizon products to clients; the enterprise solutions group (or "ESG") also included "project managers," positions that were coordinate with SEs. SEs and project managers reported to SE Managers. SEs were generally responsible for designing and pricing Verizon telecommunications systems, and for presenting design proposals. They were divided into four levels and given numerical designations of I, II, III, or IV, with SE I being the lowest and SE IV being the highest; the levels were intended to signify distinctions in technical expertise within certain assigned product specialties. However, each SE was expected to have expertise in a "bucket" of

Verizon products.  Moll was originally an SE I and was promoted in 2003 to SE II; her specialty was "traditional telephone" and voice products.

Moll continued to report to Verizon's Buffalo office, where she worked alongside three others:  Anne Byrne, a Systems Analyst retitled an SE I, who was promoted to SE II in 2001 and to SE III in 2003; and Thomas Spencer and Daniel Irving, each a Senior Systems Analyst retitled an SE II.  Byrne in early 2004 commenced a Title VII action that, to an extent, paralleled the present action.  *See, e.g., Byrne v. Telesector Resources Group, Inc.*, 339 F. App'x 13 (2d Cir. 2009).  Spencer remained an SE II until he left the group in early 2004.  Irving became an SE Manager in 2001.

Moll commenced this action in October 2004, asserting claims principally of gender discrimination in the terms, conditions, and privileges of employment, including sexual harassment by Irving, a hostile work environment, denial of promotion by Irving after he became her supervisor, and retaliation for her complaints of such discrimination, all in violation of Title VII and state law; and asserting that she was denied compensation equal to that paid to Spencer and other male co-workers for substantially similar work, in violation of Title VII and the EPA.  She filed an amended complaint in 2008, adding claims that she was subjected to new acts of discrimination and retaliation, first in 2004 by Verizon's transferring her job site from Buffalo, where she and her family lived, to Syracuse, New

York, some 160 miles away, and then in 2007 by Verizon's termination of her employment, supposedly as part of a reduction in force.

The details of Moll's factual allegations and the path of this litigation are described in opinions of the district court and this Court, familiarity with which is assumed. *See Moll v. Telesector Resources Group, Inc.*, No. 04-CV-805, 2005 WL 2405999, at *7, *12 (W.D.N.Y. Sept. 29, 2005) ("*Moll I*") (granting in part Verizon's motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Moll's hostile-work-environment claims as time-barred), *vacated by Moll III*, 760 F.3d at 204; *Moll v. Telesector Resources Group, Inc.*, No. 04-CV-805, 2012 WL 1935087, at *32 (W.D.N.Y. May 29, 2012, *amended* May 30, 2012) ("*Moll II*") (granting in part Verizon's motion for summary judgment, dismissing all remaining claims (except one for discriminatory delay in promotion, which was thereafter settled)), *vacated by Moll III*, 760 F.3d at 206; *see also id*. at 204 (vacating district court's denial of Moll's motion to compel Verizon to produce certain documents).

Following the remand by *Moll III*, Moll filed a second amended complaint, which differed from her amended complaint principally by alleging hostile work environment as separate claims rather than as aspects of her general gender discrimination claims. And following additional discovery, Verizon again moved for summary judgment dismissing Moll's claims. The district court record described in Parts II.B. through II.E. below--as developed before and after *Moll III*--includes declarations and deposition

testimony by Moll and two of Moll's female co-workers who had also brought actions alleging discrimination, hostile work environment, sexual harassment, and retaliation, as well as declarations or deposition testimony of several Verizon managers and Buffalo-based Verizon employees.

In a Decision and Order reported at *Moll v. Telesector Resources Group, Inc.*, No. 04-CV-805, 2020 WL 5593845 (W.D.N.Y. Sept. 18, 2020) ("*Moll IV*"), the district court granted Verizon's renewed summary judgment motion in its entirety. As described more fully in Part II.B. below, the court found that Moll had failed to present a prima facie case of hostile work environment, concluding that she had failed to adduce sufficient evidence of an environment that a reasonable person would have found to be hostile or abusive. The court found that Moll had also failed to present a prima facie case of discrimination or retaliation in her job site transfer to Syracuse, principally because Verizon's plan was to transfer men as well as women, and ruled that the relocation order was not an adverse employment action both because Moll was given the options, instead of accepting the transfer, of changing departments or accepting a severance package, and because she reported to Syracuse only infrequently and was on disability leave for part of the period in question. In addition, discounting contrary evidence given by Christopher Gaglione, the manager of Moll's SE group at the time of the transfer order, the district court stated that there was no clear

evidence that the transfer plan was devised or implemented with discriminatory or retaliatory intent. *See* Part II.C. below.

The *Moll IV* court also concluded that Moll failed to present a prima facie case of gender discrimination or retaliation in the termination of her employment. As described in Part II.D. below, it found that the circumstances did not give rise to an inference of discrimination, chiefly because in Verizon's reduction of force the ratio of terminated employees was two males to every female. The court further adopted Verizon's contention that Moll's claims of retaliatory termination were "belie[d]" by her manager's assigning Verizon's most lucrative client account to her.

Finally, the court found that Moll had not adduced sufficient evidence to show a genuine issue of fact to be tried as to her Title VII claims of gender discrimination or retaliation in her treatment with regard to such other matters as client entertainment tickets, vacation privileges, credit for sales to Verizon clients, performance rankings, and discipline. It found that disparities in pay resulted from factors other than gender. *See* Part II.E. below.

Having found that Verizon was entitled to summary judgment dismissing all of Moll's Title VII claims, the court ruled that Moll's claims of discrimination or retaliation under the NYSHRL, which were governed by the same principles, were dismissed for the same reasons as her claims under Title VII. Having disposed of Moll's claims, and having

dismissed counterclaims asserted by Verizon--a decision that Verizon has not appealed--the court entered final judgment. This appeal by Moll followed.

In reviewing *Moll IV*'s grant of summary judgment, we are mindful that the court referred frequently to its findings and conclusions in *Moll II*, and generally found no reason to change the results it had reached in *Moll II*. Accordingly, we take both opinions into account as appropriate.

## II. DISCUSSION

On appeal, Moll's challenges to the judgment address four categories of claims: (1) hostile work environment, (2) retaliatory job site transfer, (3) discriminatory or retaliatory termination of her employment, and (4) denial of equal pay. She contends principally that the court erred in concluding as a matter of law that there was no adverse employment action or clear retaliatory motive in her job site transfer; and that as to each of the above categories of claims the court's conclusions that her proffered evidence was insufficient to show a genuine issue of material fact to be tried failed to view the record in the light most favorable to her.

While Moll's notice of appeal indicates that it encompasses all of *Moll IV*'s dismissals of her claims, her briefs on appeal present challenges only with respect to the

above four categories. She has not argued for reinstatement of her claim that the job site transfer was discriminatory. And although her claim of denial of compensation equal to that of her male co-workers invokes both Title VII and the EPA, she has not argued that the court erred in rejecting her claims of discrimination in other facets of her employment, such as permission to work from home, discipline, performance evaluations, allocation of credit for sales, and access to customer networking opportunities such as tickets or invitations to sports events. Accordingly, we regard claims as to those other aspects as having been abandoned; the record as to those aspects will thus be considered only as they may be relevant to the above four claim categories that are argued in Moll's brief.

For the reasons that follow, we conclude that in light of the record in the district court, with all reasonable inferences drawn in Moll's favor, summary judgment was inappropriately granted as to each of the first three categories and in part as to the fourth.

A. *Summary Judgment Principles*

We review *de novo* a district court's grant of summary judgment, applying the same standards that govern the district court's consideration of the motion. "A motion for summary judgment may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving

party as a matter of law."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("*Kaytor*"); *see* Fed. R. Civ. P. 56(a).  The court's role with respect to such a motion is not to resolve disputed questions of fact "but solely to determine whether, as to any material fact, there is a genuine issue to be tried."  *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001) ("*Fitzgerald*"), *cert. denied*, 536 U.S. 922 (2002); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("*Liberty Lobby*").

In determining whether genuine issues of fact exist, "'the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) ("*Davis-Garett*") (quoting *Kaytor*, 609 F.3d at 545).  Rather, the court must "review the record 'taken as a whole.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In so doing, it "'must *draw all reasonable inferences in favor of the nonmoving party*,' . . . even though contrary inferences might reasonably be drawn."  *Kaytor*, 609 F.3d at 545 (quoting *Reeves*, 530 U.S. at 150 (emphasis in *Kaytor*) (other internal quotation marks omitted)).

Moreover, the court "'*may not make credibility determinations or weigh the evidence*,'" *Kaytor*, 609 F.3d at 545 (quoting *Reeves*, 530 U.S. at 150 (emphasis in *Kaytor*)); "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" *Davis-Garett*, 921 F.3d at 46

(quoting *Reeves*, 530 U.S. at 150); *see, e.g., Moll III*, 760 F.3d at 206 ("because the assessment of a witness's credibility is a function reserved for the jury," the summary judgment court "may not discredit" deposition testimony that is favorable to the party opposing summary judgment (internal quotation marks omitted)).  Indeed, in ruling on a motion for summary judgment, the court "'*must disregard all evidence favorable to the moving party that the jury is not required to believe*.'"  *Kaytor*, 609 F.3d at 545 (quoting *Reeves*, 530 U.S. at 151 (intermediate quotation marks omitted) (emphasis in *Kaytor*)).

To be sure, "reliance upon conclusory statements or mere allegations" will not suffice to defeat summary judgment.  *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).  Summary judgment as to a specific claim is proper when "after adequate time for discovery[,] . . . the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  But if "'the admissible materials in the record *make it arguable* that the claim has merit,'" then "[s]ummary judgment dismissing a claim" cannot be granted.  *Davis-Garett*, 921 F.3d at 45 (quoting *Kaytor*, 609 F.3d at 545 (emphasis ours)).

Finally, "an extra measure of caution is merited" before granting or affirming "summary judgment in a discrimination action because direct evidence of discriminatory intent is rare."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009).  Thus, the court

- 14 -

must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination. *See, e.g., Gallo v. Prudential Residential Services, LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

In sum, "summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict.'" *Kaytor*, 609 F.3d at 546 (quoting *Liberty Lobby*, 477 U.S. at 250). Where "there are genuine issues of material fact" that "'may reasonably be resolved in favor of either party,'" "[s]ummary judgment should be denied." *Davis-Garett*, 921 F.3d at 45 (quoting *Liberty Lobby*, 477 U.S. at 250).

B. *The Hostile Work Environment Claims*

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," *inter alia*, "such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This "prohibition of sex discrimination extends to sexual harassment," which encompasses "conduct [that] has the purpose or effect of . . . creating an intimidating[ or] hostile" work environment. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220-21 (2d Cir. 2004) (internal quotation marks omitted). Title VII "does not set forth a general civility code for the American workplace," *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("*Burlington Northern*")

(internal quotation marks omitted); but "[w]hen [a] workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is '*sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,*' . . . Title VII is violated," *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986) (emphasis ours)).

To prove a hostile work environment in violation of Title VII, a plaintiff must establish both objective and subjective elements. The misconduct shown must have been "severe or pervasive enough to create an objectively hostile or abusive work environment," that is, "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. And the victim must have "subjectively perceive[d] the environment to be abusive." *Id*. Whether a particular environment is objectively "'hostile' or 'abusive' can be determined only by looking at *all* the circumstances." *Id*. at 23 (emphasis added). Such "circumstances . . . may include" but are not limited to

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id*. "[N]o single factor is required." *Id*. And "[t]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (internal quotation marks omitted). The

- 16 -

assessment "is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

"Because the analysis of severity and pervasiveness looks to the totality of the circumstances, the crucial inquiry focuses on *the nature of the workplace environment as a whole* . . . ." *Kaytor*, 609 F.3d at 547 (emphasis in *Kaytor* (internal quotation marks omitted)). "Sex-based hostile work environment claims may be supported by facially sex-neutral incidents and 'sexually offensive' acts may be facially sex-neutral. *See Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002)." *Moll III*, 760 F.3d at 200 ("The district court [in *Moll I*] erred when it refused to consider all allegations in the Complaint in their totality, including those that were not sexually offensive in nature."). And "a plaintiff who herself experiences discriminatory harassment *need not be the target of other instances of hostility in order for those incidents to support her claim*." *Kaytor*, 609 F.3d at 547 (emphasis in *Kaytor* (internal quotation marks omitted)); *see generally Raniola v. Bratton*, 243 F.3d 610, 617 & n.6 (2d Cir. 2001) (a "hostile environment is not limited to . . . sexual behavior targeted at the complainant," "as long as there is evidence suggesting that the objectionable workplace behavior is based on the sex of the target" (internal quotation marks omitted)).

In *Moll IV*, the district court granted summary judgment dismissing Moll's hostile work environment claims for failure to proffer enough evidence to establish a prima facie case. While ruling that Moll had sufficiently "raise[d] issues of fact as to her subjective

belief that her work environment was hostile and that Verizon Business was responsible through imputation," the court found that Moll "ha[d] not established the existence of material issue of fact of the *objective basis* for hostile work environment given the number and frequency of incidents [she] presented." *Moll IV*, 2020 WL 5593845, at *16 (emphasis added).

Accordingly, as to Moll's hostile work environment claims, the only issue on this appeal is whether her proffered evidence sufficed to reveal a genuine issue to be tried as to whether a reasonable person in Moll's position would have found her working environment hostile or abusive. Viewing the record in the light most favorable to Moll, with all credibility questions and permissible inferences resolved in her favor, we conclude that summary judgment was inappropriate.

1. *The District Court's View of the Evidence*

In *Moll IV*, the district court discussed many of the instances, statements, and actions in the Verizon Business workplace in 1998-2003 that Moll viewed as harassing, abusive, and humiliating. In the *Moll IV* discussion, we count some 17 such descriptions by the court, *see* 2020 WL 5593845, at *14-*15, although some individual descriptions encompass and/or compress multiple statements or actions. We summarize them as follows.

[1] In December 1998, "a male co-worker stated to another female co-worker that she was working from home because he heard 'bedsprings creaking'";

- 18 -

[2] in 1999, Irving repeatedly called Moll while she was on a multiple-day training trip, asking that she come to his hotel room;

[3] in January 2000, Moll "was denied [hockey tickets] by [SE Manager] Michael McGowan claiming that because [Moll] was pregnant . . . she was too tired"; in 2003, Irving acquired hockey tickets for entertaining clients, for which he could be reimbursed by Verizon, and he offered them only to male, not to female, SEs;

[4] in 2001, project manager Michael Finnegan called Moll and another female co-worker "hottie[s]";

[5] Irving asked Moll whether she had an affair with another co-worker;

[6] Moll was in conversations where male employees commented on the age and attractiveness of female employees;

[7] a female co-worker told Moll that a "male coworker asked to come to her hotel room during a sales meeting (reminiscent of[)]" Irving's request of Moll;

[8] another male co-worker commented on the appearance of Moll's co-worker Sara DeLena, analogizing her to a "Bond girl"; one of DeLena's managers told her she should start exercising, implying that DeLena was overweight;

[9] in April or May of 2001, Irving left a note on Moll's desk saying that he thought about her while he was in the shower;

[10] in June 2001, Irving began to require Moll to communicate with him only in person, not by other means, a requirement he did not impose on male SEs;

[11] in January 2002, Irving asked Moll "to come back to work with him at night," when they would be "alone in the office";

[12] in February or March 2002, when Moll was talking with a group of co-workers, Irving walked up to a female worker, looked at her breasts, and said "hooters";

[13] in May 2002, Irving denied Moll permission to work from home from then on, so that Irving could continue to see her;

[14] in October 2002, Irving followed Moll to a business lunch, and when he was asked why (given that other employees were not accompanied on similar occasions), Irving stated that he wanted to "develop" Moll;

[15] during a 2003 equal employment opportunity office training program on discrimination, retaliation, and harassment attended by Irving, Irving laughed and mocked the vignettes presented; Moll then complained of Irving's behavior and itemized instances of harassment and discrimination;

[16] in 2003, Finnegan and new father David Jager were heard discussing that Jager could not have sex with his wife; Finnegan was giving out his work and fax number as "25-PENIS";

[17] in 2005, Moll sought psychological treatment due to the discrimination and harassment she suffered.

2. *Other Evidence or Details Not Mentioned in* Moll IV

In addition to the court's description of the record as to Moll's complaints about Irving and others at Verizon, her depositions and declaration--along with sworn statements from Moll's co-worker SE Anne Byrne and from Sara DeLena, who had become a Corporate Account Manager in 1996, one year before Moll became an SE--provided further details as to the approximate timing, extent, and nature of some of the incidents referred to by the court in *Moll IV*, including:

■ In or about 1998 "through 1999," Irving made comments to Moll in the workplace, in which he said she "look[ed] and smell[ed] great today"; Moll was married, as Irving knew; and Irving too was married; Moll "was offended by these comments, which were humiliating and made [her] uncomfortable";

■ one of the several notes Irving left on Moll's desk complained about "being interupted [*sic*] when we are talking," and said "I know the 23rd was unplanned & I was *definitely* thinking about the possibilities!!  You look & smell great today... Call me?" (emphasis in original);

■ in the 1999 multi-day training trip mentioned in *Moll IV,* Irving called Moll in her hotel room multiple times between 9:30 and 11:30 p.m., asking her to come to his room; he had continued to call after she had refused and had asked him to stop calling; after more than five such calls, she took the telephone off the hook;

■ Irving asked Moll "whether [she] had anything going [on] with Mr. McGowan [her then-SE Manager] or another male co-worker";

■ Irving "stated that [Moll] had the keys to Mr. McGowan's house, suggesting that [she] must be having an affair with" McGowan;

■ upon Moll's return to work after maternity leave, Finnegan called Moll and CAM Sara DeLena "hottie[s]," and he thereafter repeatedly called Moll a "hottie" "when he would see [her] every month or two during the time [they] worked together, which was through 2003 or 2004";

■ although the district court noted Verizon's contention that Irving's sexual pursuit of Moll had ceased in the Fall of 1999 when Moll's pregnant state became apparent, it was in 2001, after Moll returned from maternity leave, that Irving--who by then was Moll's supervisor--left his note on her desk saying that he thought about her while he was in the shower;

■ in 2003, when Finnegan and Jager discussed Jager's inability to have sex with his wife for six weeks after the birth of the baby, they did so near the desks of Byrne and Moll, both of whom heard Finnegan say that "any guy who had to go that long without sex would be in an 'upright and locked position'";

■ although Moll and Byrne complained to Verizon's equal employment opportunity office ("HR") about, *inter alia*, Irving's laughing at and mocking the April 2003 HR training session on discrimination, retaliation, and harassment, in response Verizon did nothing;

■ soon after that HR training session, Finnegan telephoned SE II Spencer at work, asking to receive a fax at his Verizon fax number, and stating that his number was 25-PENIS; Spencer, whose desk--like those of Moll and Byrne, was in a cubicle--announced Finnegan's number to the people sitting nearby; he then immediately went to Moll's desk and told her that Finnegan's Verizon fax number was 25-PENIS;

■ Spencer testified that he viewed Finnegan's fax number as "minor compared to other things that were always said every day"; he testified, "like I said, the office atmosphere, that one statement . . . *was nothing compared to what went on*" (emphasis added).

In addition to these details, the district court in *Moll IV* largely ignored ESG's workplace conditions for women as a whole, as it made scant mention of the sexual harassment described by Sara DeLena (who, like Moll and Byrne, had filed her own Title VII action). From 1995 to 2002, DeLena's manager was McGowan, and DeLena complained to him frequently. The evidence as to DeLena--who is usually the female "co-worker" referred to by the district court in *Moll IV*--reveals a working environment repeatedly punctuated with sexual comments, innuendo, and statements or treatment demeaning to women, including the following:

■ CAM Timothy Mitten, at a charity event for which Verizon had purchased a table at which Verizon clients were sitting, referred to CAM DeLena as "his secretary";

■ beginning in or about 1997, Finnegan who was first a CAM and later a project manager in the group, "regularly" made sexually offensive comments, and comments about DeLena's appearance;

■ in a work meeting in or about 1997, attended by DeLena, Finnegan, McGowan, and another, Finnegan described a certain individual as so stupid that he could "'screw up a wet dream'";

■ in the same meeting, in a discussion about hiring a female, Finnegan stated that her hiring would depend on what she looked like;

■ after that meeting DeLena complained to McGowan and asked him to get Finnegan to "clean up his act";

■ in a 1998 conference call, with numerous CAMs participating, Finnegan asked DeLena whether she was at home, stating that he could "hear the bedsprings creaking"; DeLena thereafter complained to McGowan and asked if he had spoken to Finnegan; McGowan said he had and that he would do so again;

■ in 2000, DeLena went to a meeting in McGowan's office; when she entered, Finnegan was there and told DeLena she looked good; McGowan asked if her dress was new, because it even smelled new; and Finnegan told her, "come sit on my lap";

■ DeLena promptly turned and walked out; she later complained again to McGowan, who said he had spoken to Finnegan in the past and would do so again;

■ thereafter, Finnegan's comments did not cease but rather "accelerated"; he referred to DeLena as a "hottie" two or three times a week; she asked him to stop, but he just laughed and persisted, and he continued to comment on her appearance, her dress, and her hair;

■ DeLena again complained to McGowan, who said he would talk to Finnegan;

■ in or around 2000, when Finnegan and McGowan were discussing the new President of Verizon's Sales Division--a woman--Finnegan commented that she was not "too bad looking"; McGowan responded that she "had a lot of miles on her"; when a female co-worker who was present asked what that was supposed to mean, Finnegan or McGowan replied by saying the woman was old;

■ in November 2000, DeLena was stuck in the office because of a severe snow storm; later that week Finnegan told her he was only sorry that she was in the office alone without him;

■ in December 2000, at the Company Christmas party, DeLena was in the buffet line next to Finnegan and McGowan, and Finnegan told DeLena that he had asked the restaurant to keep the whipped cream for her to take home so she could have a "hot time with" her husband;

■ DeLena promptly turned and looked at McGowan, but he remained silent;

■ around Christmas in 2000, Moll was in a van with members of the Buffalo office enterprise solutions group for an outing to a casino, and when DeLena entered, Finnegan said "now we have two old bags in the van";

■ in or about January 2001, when DeLena was to depart for a sales kickoff meeting at a resort, Finnegan came to her office and asked if she had a room alone at the resort; when she said she did, he told her he was going to come knocking at her door in the middle of the night; DeLena promptly walked out of her office;

■ in addition, prior to that meeting, Finnegan had said, "how are we going to get Sara in the hot tub?  Hopefully without a suit";

■ during the return trip from that meeting, Finnegan said to DeLena, "I hope you understand what I mean when I make comments about how you look, your body is so . . ."; DeLena interrupted him and told him to stop making comments about her body, her looks, and her appearance; she later complained again to McGowan, who told her he would take care of it;

- McGowan himself regularly made comments about women's appearances; he also said women would be more appealing if they smelled like bacon and eggs, or vanilla;

- McGowan regularly asked DeLena about the appearance of certain of her friends; as to one, he asked "why does she make herself so unattractive"; on another occasion he asked "why older women would have plastic surgery when it obviously wouldn't make a difference in their attractiveness";

- McGowan also regularly claimed to have a cousin who was really his sister, stating that his parents had given her away because they didn't want to have any girls;

- David Winley, who joined the enterprise solutions group as a Technical Support Specialist in April 2002, regularly made comments with respect to DeLena's appearance, referring to her as a "Bond woman";

- Winley also regularly referred to DeLena's perfume and said "oh, Opium, don't do that to me," and once said "I can't sit next to you, I don't want to get in trouble";

- in May 2001, DeLena began treating with a psychiatrist because of the continual and severe emotional stress she was experiencing at work; in May 2002, she was placed on disability leave, which lasted more than a month;

- in 2002, when DeLena was meeting with a client and Kevin Dean, a recently hired SE, the client asked whether Dean worked for DeLena; Dean responded, "I don't work for her, and she'll be working for me before I work for her."

(*See* Affidavit of Sara DeLena dated November 22, 2005, ¶¶ 72, 86, 104-127; *see also* Affidavit of Anne M. Byrne dated June 12, 2006 ("Byrne Aff."), ¶¶ 11, 14, 44, 50-56, 59-61, 64-65, 67-72, 76-77 (describing the office atmosphere as oppressive to women, referring to many of the above events, as well as to her own complaints of gender discrimination, of retaliation by Irving for her complaints, and of the lack of any remedial action by Verizon).) Moll likewise

was aware of these events and found them demeaning and humiliating. (*See* Declaration of Cindy L. Moll dated September 22, 2017 ("Moll Decl."), ¶¶ 11, 58, 65, 70, 73-77.)

As indicated, many of the sexually offensive comments were made by members of the enterprise solutions group in the presence of their managers--principally McGowan or Irving--and the managers did nothing to admonish the speakers, or even to suggest that their behavior was not acceptable. DeLena repeatedly complained to McGowan about Finnegan; and while McGowan repeatedly said he had spoken and/or would speak to Finnegan, McGowan's utter silence when Finnegan made offensive or demeaning statements or propositions in McGowan's presence suggests that McGowan had done and/or would do nothing to criticize such behavior.

It is perhaps unsurprising that DeLena's complaints did not result in relief from the numerous sexual comments and innuendo, given that McGowan himself--and some other SE Managers--made demeaning comments or apparently relished such comments by others. McGowan, in 1999 when Byrne became an SE I, told Moll that Byrne would actually have been made an SE II "if she had only smiled more." And when Moll and DeLena were standing in an open area of the office in February or March 2002 with a group of other workers, it was then-SE Manager Irving who walked up to DeLena, looked at her breasts, and said "hooters"; and another manager from the Company's Albany office who was present just said, "you said hooters, I can't believe you said that," and laughed.

- 26 -

In sum, Moll proffered evidence that overtly sexual or sexist comments, sexual innuendos, and gender-based disparagements were regularly directed at women in Verizon's enterprise solutions group or made about women in general--such statements being made in the woman's own office, or near a woman's desk, or to a woman in a manager's office, or about a woman amid persons in a casual gathering in a common office area, or in conference calls or meetings among co-workers, or in a van heading for a staff outing, or in a buffet line at an office party, or in meetings with clients. She proffered evidence that most managers did nothing to discourage that objectionable conduct--and that some managers participated in such conduct. Perhaps most troubling, as discussed above, Moll pointed to evidence that Irving--who as her co-worker had harassed her with sexually connotative comments and requests to come to his hotel room--after becoming her manager, left her a note saying that he "thought about [her] when he was in the shower." And as her manager, he insisted that she communicate with him only in person, demanded that she stay at the office alone with him late at night, and followed her to client lunches against her wishes because he wanted to "develop" her. Irving attended an HR awareness presentation at which he simply laughed throughout. Although Moll complained to HR about Irving's demonstration of contempt for the HR training presentation, Verizon did nothing in response.

The district court ruled that the incidents that Moll experienced or knew about were "puerile" and "offensive," but found that they were not "humiliating" and "did not unreasonably interfere with Plaintiff's work." *Moll IV*, 2020 WL 5593845, at *15. Viewing the evidence as a whole in the light most favorable to Moll, we cannot agree that no reasonable person could find the working environment hostile and abusive, or that no reasonable person could find that that environment adversely affected her ability to concentrate on simply performing her job well. Rational jurors may disagree as to whether these incidents would negatively alter the working conditions of a reasonable employee; but "the potential for . . . disagreement renders summary judgment inappropriate." *Fitzgerald*, 251 F.3d at 360 (internal quotation marks omitted).

C. *The Claim of Retaliatory Transfer to Syracuse*

In September 2003, Moll filed a charge against Verizon with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of sex discrimination, including sexual harassment, a hostile work environment, and retaliation for complaining about the discriminatory working conditions. In October 2004, Moll commenced the present action, which was served on Verizon in November.

1. *Verizon's Transfer of Buffalo SEs to Syracuse*

By the Fall of 2004, the sales engineer group supporting CAMs in the Buffalo office consisted of SEs Moll and Byrne, newly hired SE Michael Chase, and project manager Finnegan. Their manager was Gaglione, who had caused Verizon's HR to make the Title VII awareness video presentation in April 2003. Gaglione was stationed in Syracuse and also managed SEs in Verizon's Syracuse office; Gaglione was supervised by then-Branch Sales Engineering Manager Robert Dixon. In December 2004, Dixon and Gaglione, with the Verizon HR Manager on the telephone, met with Moll, Byrne, Chase, and Finnegan and informed them that "all of [their] jobs were being moved to Syracuse," which is some 160 miles from Buffalo (Moll Decl. ¶¶ 104-105). Dixon described the move as part of "a new model," under which certain SEs would "be located in the same office as their managers." (Deposition of Cindy L. Moll, November 13, 2006 ("Moll 2006 Dep."), at 250.)

Moll, Byrne, Chase, and Finnegan were informed that if they chose not to go to the Syracuse office--which was about a two-and-a-half-hour drive from Buffalo--they had the options of looking for another job within Verizon or taking a severance package and being taken off the payroll no later than February 2005. Moll and Byrne immediately asked for more information about the severance option; but they were told that the details of the severance package would not be made available to them until they agreed to accept it. (*See*, *e.g.*, Byrne Aff. ¶ 92 ("We were given three choices: to report to that office, to find a new job,

or take an early retirement," but "they would not provide us with any of the details . . . so that we could determine the financial ramifications."); *id*. ¶ 94 ("They said they would not provide that information until I agreed that I would take that option.").)  Moll and Byrne also sought information from the Company's internal website, which stated that in an employee-buy-out plan, Verizon "retained the discretion to change the terms and conditions," including "release" provisions.  Thus unable to learn the terms or amount of the severance "offer," warned that even if disclosed the terms could be changed at the whim of Verizon, and wary of "release" provisions' potential effect on their pending lawsuits against Verizon, Moll and Byrne found the severance option unreasonable.

Finnegan, within a few days after the December meeting, told Gaglione that he had found another Verizon job.  Byrne eventually also found a new position within Verizon.  As described in Part II.C.5. below, Moll was unable to find a new position at Verizon in the short time allowed.  Thus, Moll and Chase were the only Buffalo employees whose job sites were actually transferred to Syracuse.

Moll sought dispensation to work from home, pointing out that she had two young children, that her husband worked in Buffalo, that she was enrolled in week-night courses at a Buffalo college, where she was pursuing a Bachelor's degree, and that she assisted in the care of her widowed and handicapped mother in Buffalo, who relied on Moll for transportation to medical appointments.  Gaglione--after discussing Moll's request with

- 30 -

Dixon and Dixon's supervisor, Regional Sales Director Mark VanHoesen--was required to deny Moll's request. (*See* Deposition of Christopher T. Gaglione, December 13, 2006 ("Gaglione 2006 Dep."), at 378; Declaration of Christopher T. Gaglione dated November 4, 2011 ("Gaglione 2011 Decl."), ¶ 26.)

Thus, in February 2005, Moll was formally assigned to work in the Syracuse office. Gaglione informed Moll and Chase that they should be in Syracuse on days they were not meeting with a client, but he provided some flexibility. He told them that on a day when they had an appointment with a customer in Buffalo, they would not need to come to Syracuse and could work at home or in the Buffalo office for the rest of the day. Gaglione testified that Moll was a "rule follower"; and Moll testified that she had as many appointments in Buffalo as possible, and when she did not have such an appointment, she was in Syracuse.

However, Dixon and VanHoesen eventually became aware that Moll was sometimes in Buffalo, and they made it clear to Gaglione that they disapproved of his flexible approach. Thus, in a July 2005 email directed to Moll and Chase--but not to any other Syracuse-based SEs--Dixon stated:

> It is the expectation that you report to work in Syracuse unless there is a compelling reason not to do so. If you have a meeting in Buffalo in the morning, you are expected to be in Syracuse in the afternoon. If there is a meeting in Buffalo in the afternoon, you are expected to be in Syracuse in the morning. . . .

Please confirm via e-mail that you are adhering to these policies.

(Robert Dixon email to Cindy Moll and Michael Chase dated July 5, 2005.) Soon after receiving this email, Chase left Verizon. Moll stayed on, and Dixon telephoned her periodically to make sure that she was in the Syracuse office.

In August 2005, after Chase had left, Moll received further stringent orders. She was informed by Gaglione that she "was required to be at [her] desk in Syracuse [for] a minimum of . . . 3 days per week, 8 hours a day," totaling at least "24 hours per week." (Moll Decl. ¶ 118.) Gaglione stated that he was instructed to impose this order by Dixon, and that this requirement was imposed on no other SE. (*See* Deposition of Christopher T. Gaglione, May 10, 2017 ("Gaglione 2017 Dep."), at 103; Gaglione 2011 Decl. ¶ 30.)

Because of the stress she was experiencing at Verizon as a result of her perceived mistreatment, Moll had begun treating with a psychiatrist, Dr. Maria Nickolova, in June 2004. In August 2005, the revised command that Moll spend at least three eight-hour days a week in Syracuse, on top of Dixon's monitoring and other work-related pressures, caused the stress and anxiety of Moll's job to be overwhelming. Dr. Nickolova required Moll to take a disability leave. As her time away from work progressed, Moll began to see a slow, but hopeful, lessening of her anxiety.

Verizon's location of its Buffalo-centric SEs in Syracuse lasted only about a year. During Moll's leave of absence, Verizon completed a merger with telecommunications

provider MCI. MCI was puzzled by the placement in Syracuse of SEs who assisted Buffalo-based CAMs and Buffalo-based clients, and the job site of Buffalo-centric SEs was promptly returned to Buffalo. (*See* Gaglione 2017 Dep. 23 ("MCI got involved and they were like, 'Hey, why are Buffalo SEs reporting to Syracuse?' They moved it right back.").) Gaglione would remain the SE Manager in Syracuse; someone else would manage the SEs in Buffalo. In February 2006, Gaglione called Moll to inform her that as a result of the merger, her duty station was transferred back to the Buffalo area. She was no longer within the VanHoesen-Dixon line of supervision, and she was no longer required to report to Syracuse.

Moll told her psychiatrist that she was greatly relieved to learn that her work location had changed, and Dr. Nickolova cleared her to resume work in March 2006. In 2004, Moll had asked to be allowed to work in Verizon's office in Amherst, New York, a Buffalo suburb, because it was nearer to her home and would provide free parking; Gaglione had denied her request. In his February 2006 call, Gaglione told Moll she could return to work either at her original Buffalo location or in the Amherst office. Learning that Dixon and Irving would be working in Amherst, Moll chose the Buffalo office.

Moll returned to work in Buffalo in March 2006. Her new manager was Mark Witte, who had come to Verizon from MCI. As discussed in Part II.D. below, Moll's return to work was short-lived because in early 2007, Verizon implemented a reduction in force, and Moll was one of the employees terminated.

2. *Verizon's First Motion for Summary Judgment*

In 2008, Moll amended her complaint in this action to add allegations that both her 2007 termination and her 2004 job site transfer to Syracuse were the result of gender discrimination or retaliation. Following a period of discovery, Verizon moved in 2011 for summary judgment dismissing all of Moll's claims.

With respect to Moll's claims that her job site transfer to Syracuse was discriminatory or retaliatory, Verizon argued that it could not be found to have discriminated on the basis of sex because the decision had been to transfer two women and two men; they were treated equally. Arguing that the transfer was also not retaliatory, Verizon submitted deposition testimony given by Gaglione in 2006 that the transfer had been a "business plan," and that "the whole purpose of being in Syracuse, according to Mr. Dixon, was that everybody was going to be there together." (Gaglione 2006 Dep. 281, 290.)

In opposition to Verizon's 2011 request for dismissal of her claim that her job site transfer was discriminatory or retaliatory, Moll submitted a declaration from Gaglione-- who by then was no longer employed by Verizon. (*See* Gaglione 2011 Decl. ¶ 1.) In this declaration, Gaglione, who had participated in relevant 2004 meetings with Dixon and VanHoesen, stated that the goal of the decision to transfer the four Buffalo job sites to Syracuse had in fact been to retaliate against Moll and Byrne for their complaints of

discrimination and retaliation, and to make their jobs so onerous that they would leave ESG entirely. Gaglione stated:

12. *The various complaints of discrimination and retaliation by both Ms. Moll and Ms. Byrne were considered to be very disruptive to the business operations* by the management of the former Enterprise Solutions Group of Verizon, (ESG), which was the group in which we worked. *These were considered especially disruptive by the management of ESG, including Mark VanHoesen and Robert Dixon.*

13. In late 2004, I attended meetings with Mr. VanHoesen and Mr. Dixon in which *Mr. Dixon proposed transferring all of the SEs and Project Managers in the Buffalo office of ESG to the Syracuse office of ESG.* It was agreed that we would offer them the opportunity to work in Syracuse, find a new job within Verizon, or accept a severance package.

14. *The primary factor for this decision was an effort to retaliate against both Ms. Moll and Ms. Byrne for their continuing complaints of discrimination and retaliation. Mr. Dixon and Mr. VanHoesen wanted to make life as difficult as possible for Ms. Moll and Ms. Byrne and stated that they believed this action would force them to leave ESG.*

15. *We knew that both Ms. Moll and Ms. Byrne had ties to the Buffalo area* and believed that, *by forcing them to either move to Syracuse or travel there on a daily basis, we could force them to leave the ESG by finding a new position within Verizon or accept the severance package.*

16. We justified this transfer with the *pretext that all SEs and Project Managers (which was a coordinate position to SEs) should work together.* Since I was the Sales Engineer Manager and was located in Syracuse, the decision was made to force them to travel to Syracuse.

17. *It was also decided that the SEs and Project Managers* would be required to report to the Syracuse office; they *would not be permitted to work at home. Mr. Dixon, in particular, was adamant that the SEs would have to physically report to Syracuse when they were not meeting with customers.* This decision would affect four people: Ms. Moll, Ms. Byrne,

Michael Chase, and Michael Finnegan. All were SEs, except for Mr. Finnegan, who was a Project Manager.

(Gaglione 2011 Decl. ¶¶ 12-17 (emphases added).)

Gaglione stated that despite there being "some logic" in placing all SEs and project managers in a single location, that logic was myopic. Dixon's plan moved the SEs and project manager to Syracuse; but the job of these employees was to assist the CAMs and the CAMs' clients. The CAMs were in Buffalo--as were most of their clients--and none of the CAMs were to be moved.

Thus, *we were splitting up the SEs from the CAMs that they supported*. Furthermore, we had numerous clients in Buffalo for whom these SEs provided support. *Thus, these SEs would lose hours every day traveling between Buffalo and Syracuse to meet with the clients and CAMs to whom they provided support. This was an unproductive use of their time and undercut any business justification for this decision.*

(*Id*. ¶ 18 (emphases added).) Gaglione also noted that "this would be the only ESG office in which CAMS and SEs did not work together in the same physical location." (*Id*.; *see also id*. ¶ 23 ("I had reservations about the business merits of this plan"; "I regret that I failed to do more to complain about the retaliatory nature of the plan. At that time, however, I was more concerned about losing my job.").)

### 3. *Title VII Antiretaliation Principles*

Title VII prohibits an employer from "discriminat[ing] against" an employee "because he [or she] has," *inter alia*, "opposed any practice" that Title VII forbids or "has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). The purpose of this "antiretaliation provision" is to "prevent[]" employers from interfering "with an employee's efforts to secure or advance [the] enforcement" of Title VII's basic protections against discrimination. *Burlington Northern*, 548 U.S. at 63.

To present a prima facie case of retaliation under this provision, a plaintiff must show that (1) "she participated in an activity protected by Title VII," (2) this "participation was known to her employer," (3) the employer "subjected her to a materially adverse" action thereafter, and (4) a "causal connection" existed between the "protected activity" and the adverse action. *Kaytor*, 609 F.3d at 552. With respect to the third requirement, the Supreme Court made clear in *Burlington Northern* that the antiretaliation provision applies to "employer actions that would have been materially adverse to a reasonable employee," regardless of whether the action itself was "workplace-related or employment-related." 548 U.S. at 57, 67. An action qualifies as "materially adverse" if it is "harmful to the point that [it] *could well dissuade a reasonable worker from making or supporting*

*a charge of discrimination*." *Id*. at 57 (emphasis added). This standard is plainly an objective one, but *Burlington Northern* emphasized that

> *[c]ontext matters*. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. . . . *A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . .* [And] an act that would be immaterial in some situations is material in others.

*Id*. at 69 (internal quotation marks omitted) (emphases ours); *see, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010).

The final element of a prima facie retaliation case, requiring proof of a "causal relationship" between the protected activity and the adverse action, can be established either (1) "directly, through evidence of retaliatory animus" toward the plaintiff, or (2) "indirectly," through "circumstantial evidence." *Hicks*, 593 F.3d at 170 (internal quotation marks omitted). Such circumstantial evidence may include "[c]lose temporal proximity" between the plaintiff's protected activity and the adverse action taken against her. *Kaytor*, 609 F.3d at 552.

4. *The Retaliatory-Transfer-Claim Decisions in* Moll II *and* III

The district court initially, in ruling on Verizon's 2011 motion for summary judgment, found that Moll had "met the first two elements in establishing a *prima facie* case of retaliation," *Moll II*, 2012 WL 1935087, at *20, but had failed with respect to the third and

fourth. As to the third, the court found that Moll had not shown any adverse employment action because she had not shown any of the typical adverse actions such as loss or diminution in her position, responsibilities, or compensation. And it ruled that, as Moll "regularly worked from home during the first six months of her assignment in Syracuse and was on disability leave for another seven months and did not report to Syracuse during that time, she was not negatively impacted by the transfer." *Id*.

As to the fourth element, the court found a lack of any causal connection between the employment action and Moll's Title VII complaints. It ruled that Moll was not compelled to accept the job site relocation, because she "was presented with several options"; and "in lieu of accepting a severance package or transferring to a different job within the company and remaining in Buffalo," she "chose to relocate" to Syracuse "knowing that the reporting location would be distant from her home in Buffalo." *Id*. The court found that Verizon could not have intended its offered choices to be onerous, so as to dissuade a reasonable employee from engaging in protected conduct, because Moll "only made it known that the relocation would be a hardship after she had agreed to take the position in Syracuse." *Id*.

The court concluded that "[t]he transfer, under these circumstances, cannot be said to be the type of activity that might well dissuade a reasonable employee from engaging in protected conduct, but rather an undesirable consequence resulting from Plaintiff's choice

to remain in her current position." *Id*.; *see id*. at *21 ("Plaintiff has not shown that the restructuring plan was linked to her discrimination complaints.")

The *Moll II* court noted Gaglione's statement in his 2011 declaration that "the primary factor for her Syracuse transfer and Verizon's refusal to allow Plaintiff to work from home" had been "an effort to retaliate against her for her EEOC activity." *Id*. at *22.  But the court concluded that it "must disregard Gaglione's statement, . . . because it contradicts his prior deposition testimony" which indicated that the transfer decision resulted only from legitimate, non-discriminatory business concerns.  *Id*.

In *Moll III*, this Court, *inter alia*, reversed an order of the district court that denied certain of Moll's discovery requests; and as a result we also vacated the grant of summary judgment dismissing her discrimination and retaliation claims.  *See* 760 F.3d at 204. In so doing, we did not foreclose a new decision granting summary judgment in favor of Verizon "[i]f, following discovery, Moll [were] unable to establish a genuine issue of material fact suggesting Verizon discriminated or retaliated against her."  *Id*.  And we were constrained to note--lest an avoidable error be repeated on remand--

> that the district court erred when it concluded that it "must disregard" Christopher Gaglione's sworn statement that Moll's transfer was motivated by retaliatory intent because it contradicted his prior deposition testimony. *Moll [III]*, 2012 WL 1935087, at *22.  The district court was not required to disregard Gaglione's testimony.

*Moll III*, 760 F.3d at 204-05. Although "[t]he 'sham issue of fact' doctrine prohibits *a party* from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony," *id*. at 205 (emphasis in *Moll III* (other internal quotation marks omitted)), we pointed out that

> Gaglione was not a party to the action, nor did he have a familial or other close relationship with the plaintiff that suggests Moll could influence Gaglione's testimony. Moreover, there is nothing in the record to suggest that Gaglione submitted the declaration solely to create a genuine issue of fact. Therefore the district court was not *required* to disregard Gaglione's second sworn statement.

*Id*. (emphasis in original). Further, noting that we were not even convinced that Gaglione's 2011 declaration was inescapably and unequivocally contrary to his earlier deposition testimony--seeing "a readily apparent, plausible explanation for any inconsistency in his testimony"--we viewed "the veracity of the witness in these circumstances [as] present[ing] a quintessential question of fact for the fact-finder." *Id*. at 206.

5. *The* Moll IV *Dismissal of the Retaliatory Transfer Claim*

Following the *Moll III* remand, Verizon produced additional documents; and more depositions were conducted by both sides, including further depositions by Verizon of Moll and Gaglione. In 2017, Verizon served its second motion for summary judgment seeking the dismissal of all of Moll's claims.

On the remand from *Moll III*, the district court in *Moll IV* concluded that the record, as expanded or reconsidered on remand, did "not change the result found by this Court in 2012." *Moll IV*, 2020 WL 5593845, at *19 (citing *Moll II*, 2012 WL 1935087, at *20). The district court also apparently viewed its job on remand as limited to a single issue.

It stated that the "issue of fact" raised by Gaglione's description of "the ca[us]al relationship" between Moll's complaints of Title VII violations and "her transfer to the Syracuse office" was "the one issue the Second Circuit explicitly remanded for this Court's reconsideration." *Moll IV*, 2020 WL 5593845, at *17. But the district court found that "[t]his Gaglione testimonial fact issue that in part led to the remand, . . . need not be resolved or be found to be a basis to deny summary judgment." *Id*. at *18. Reiterating rationales from its decision in *Moll II*, and endorsing the conclusion that the relocation of Moll's job site to a city 160 miles away was a "trivial" matter, *Moll II*, 2012 WL 1935087, at *29, the *Moll IV* court concluded that because Moll

> never appeared in the Syracuse office (either by teleworking or scheduling appointment[s] exclusively in Buffalo and later going on disability leave, findings not challenged by the Second Circuit . . . ) and Plaintiff was given *three choices* when the transfer was ordered (either go to Syracuse, work at a different job with Verizon in Buffalo, or take a severance package, . . .) the order to transfer to an office she never appeared in was a *trivial* harm, . . . not a material adversity that a reasonable employee would have [felt] dissuaded them from acting.

*Moll IV*, 2020 WL 5593845, at *16 (emphases added).

- 42 -

*Moll IV* also endorsed *Moll II*'s views that Moll's acceptance of the transfer to Syracuse was a voluntary choice because she was given alternative "options," and that the transfer was not an adverse employment action because she worked from her home for the first six months and was on disability for the last seven, *see Moll II*, 2012 WL 1935087, at *20. Thus, the *Moll IV* court stated that Moll "fails to establish that she suffered an adverse employment action from" the "transfer to Syracuse" because "she was (a) given the choice of whether to transfer, change departments, or accept a severance package," "or (b) was given flexibility by Gaglione in actual appearances in Syracuse." *Moll IV*, 2020 WL 5593845, at *18.

The *Moll IV* court entirely discounted the evidence that any flexibility initially granted by Gaglione was directly countermanded by the harsh requirements Dixon imposed in July 2005 that Moll be physically present in Syracuse--even for a half day if she had a half-day appointment in Buffalo--and in August that she must be present in Syracuse at least 24 hours a week, leading to Moll's going on disability leave. The court stated

> each day from August 29, 2005, when placed on disability until she was reassigned to Buffalo in February 2006 and later returned from disability is a period when she did not have an adverse employment action because she was effectively not employed (*despite the source of the disability*).

*Id*. (emphasis added).

Finally, the court stated that because Verizon's insistence on frequent attendance in Syracuse was directed at "both [Moll] and Chase," it was "not clear that the transfer was retaliatory or directed to Plaintiff merely because of her gender." *Id*. at *19.

We have several difficulties with the district court's decision in *Moll IV*, as it both misconstrued our decision in *Moll III* and failed to apply certain Title VII and summary judgment principles. To begin with, our *Moll III* opinion does not support the district court's suggestion that its refusal to consider Gaglione's 2011 declaration was to be the only issue on remand. In addressing the district court's granting of summary judgment, we ruled:

> *the district court abused its discretion when it denied Moll's motion to compel documents* related to Verizon's Reduction in Force events and, therefore, [we] order the district court to compel production of such documents. *Accordingly, we VACATE the judgment* of the district court *insofar as it granted in part Verizon's motion for summary judgment*.

*Moll III*, 760 F.3d at 200 (emphases added); *see also id*. at 204 ("Because we reverse the district court's order denying Moll's motion to compel, we vacate the summary judgment."). We proceeded to mention Gaglione's 2011 declaration because the district court had also erred in refusing to consider it; and since the case was being remanded for further proceedings, it would have been inefficient not to caution against a repetition of that error.

Nor does our *Moll III* decision support the district court's suggestion in *Moll IV* that this Court approved of "findings" in *Moll II* that because Moll initially did not go to the Syracuse office and thereafter was "on disability leave," the Syracuse transfer was not a

materially adverse employment action but rather was "trivial," *Moll IV*, 2020 WL 5593845, at \*16 (discussing *Moll II*). Our opinion did not purport to determine whether genuine issues of material fact were revealed in the record as it then existed before us--much less to anticipate whether or not the record would be sufficient to show such issues after new proceedings following our remand. We left the assessment of the eventual record to be performed, in the first instance, by the district court.

As to the merits of the *Moll IV* decision, we have difficulties with its assessment of the record and its view of what can constitute an adverse employment action. First, we disagree with its decision that the transfer of Moll's job site to Syracuse could not have been viewed as an adverse employment action on the theory that Moll was not compelled to accept that transfer because she was offered other options that the district court apparently found viable.

In finding that Moll's going to Syracuse was a voluntary "choice" among several "options," the court did not take the record in the light most favorable to Moll. There is no dispute that, if she did not wish to accept the transfer, she was presented with two alternatives: (1) find another job at Verizon, or (2) take a severance package. But Gaglione testified that the first option provided an unrealistically short time to get another position within Verizon. He said, "it was nice to say you can either move; you can get a job; or you can take a package. But the truth is it[ was] hard in a short period of time to find another job

- 45 -

. . . within [the] company," and "everyone" knew it. (Gaglione 2017 Dep. 76.) Gaglione stated that he thus had surreptitiously given Finnegan and Chase, the two males, advance warning of the transfer plan because they were "collateral damage" from the decision to retaliate against Moll and Byrne. (Gaglione 2011 Decl. ¶ 20.)

According to Moll, she and the others were informed of the transfer plan on December 3, 2004, and "were told that [they] had until 2/11/05 to decide amongst [the] three options how . . . to proceed." (Moll's flexible work arrangement request dated January 11, 2005.) However, on January 10, a month before that original deadline, she and Byrne were informed that if they did not commit to continue working "by close of business on 1/11/05 . . . a reduction in force package would be issued" and their ability to retain their positions was not guaranteed: "a requisition would be opened to refill our jobs in Syracuse," and "if a viable candidate came forward and an offer was on the table, we would no longer have a job." (*Id*.) Thus, not only was Moll given an unrealistically short job-search time at the outset; but the original period was thereafter abruptly shortened by a month, and she was required to make a decision the next day.

The second "option," the severance package, was unrealistic as a matter of substance. To begin with, Verizon would not disclose any details unless and until Moll agreed to accept the package in advance. In addition, according to the Verizon internal website, Verizon would be free to change the terms. Acceptance of such an "offer" would

leave the employee at the mercy of the employer--and here, an employer who was already believed to have engaged in prohibited discrimination and retaliation.

Further, the district court's characterization of Dixon as "believ[ing]" that he had "'a solid business reason'" for "reassigning staff (including [Moll])" to Syracuse, *Moll IV*, 2020 WL 5593845, at *17 (quoting Gaglione 2017 Dep. 20), neither takes the record in the light most favorable to Moll nor accurately reflects the thrust of Gaglione's deposition testimony. Gaglione testified that "the purpose of developing the plan from [Dixon's] standpoint was to get them to leave." (Gaglione 2017 Dep. 76; *see* Gaglione 2011 Decl. ¶ 14 ("*Mr. Dixon and Mr. VanHoesen* wanted to make life as difficult as possible for Ms. Moll and Ms. Byrne and *stated that they believed this action would force them to leave* ESG." (emphases added)).) The "choice" offered by Dixon was a virtual Hobson's Choice, since he sought to push Moll out the door.

In sum, there were not several realistic "options" among which Moll could choose. Three possibilities were presented, two of which a rational juror would be entitled to view as mirages that were temporally or substantively unacceptable. The alternatives to accepting the transfer to Syracuse were not reasonable options.

Nor could the district court properly rule as a matter of law that the sole concrete option offered to Moll by Verizon, *i.e.*, to accept the transfer to Syracuse, was not an adverse employment action. Although the *Moll II* opinion referred to *Burlington*

*Northern*'s observation that, in identifying materially adverse employment actions, "context matters," *Moll II*, 2012 WL 1935087, at *20 (internal quotation marks omitted), the court proceeded throughout either to ignore the principle or to ignore the actual context. For example, *Moll II* found that Verizon could not have intended to impose a retaliatory hardship on Moll by moving her job site to Syracuse because, the court found, Moll "*only made it known* that the relocation would be a hardship *after* she had agreed to take the position in Syracuse." *Moll II*, 2012 WL 1935087, at *20 (emphases added) (apparently referring to Moll's listing of her Buffalo ties with regard to her young children, her husband's work, her mother's health needs, and her evening college classes). But most, if not all, of these circumstances were well known to Verizon: Just a few years earlier, Moll had been on maternity leave from Verizon; Moll's husband worked for Verizon; and Moll's college classes were being paid for by Verizon. Gaglione, speaking of his meetings with Dixon and VanHoesen, testified "we all knew [Moll and Byrne] would not move to Syracuse. That was not a possibility." (Gaglione 2017 Dep. 76; *see, e.g.,* Byrne Aff. ¶¶ 86-87 (a year earlier, Byrne had interviewed with Gaglione for an SE IV position that was posted for the Syracuse office and had made clear that she wanted to perform that job by telecommuting and would not move to Syracuse); Declaration of Christopher T. Gaglione dated April 26, 2006 ("Gaglione 2006 Decl."), ¶ 11 (same); Gaglione 2011 Decl. ¶ 15 ("We knew that both Ms. Moll and Ms. Byrne had ties to the Buffalo area and *believed that, by forcing them to either move to Syracuse*

*or travel there on a daily basis, we could force them to leave the ESG by finding a new position within Verizon or accept the severance package*." (emphasis added)).)

Nor did the court in *Moll II* or *IV* adequately appraise the Syracuse transfer in the context of the additional time demands imposed--either in light of the distance in itself or in light of the distance combined with the stringent "physically report[ing] to Syracuse" requirements about which "Dixon, in particular, was adamant" (Gaglione 2011 Decl. ¶ 17). These included the order that Moll be present in Syracuse at least three days a week, each day for a minimum of eight hours. Neither the *Moll II* nor the *Moll IV* decision mentioned the distance between Buffalo and Syracuse--some 160 miles (Gaglione estimated perhaps "180 miles" (Gaglione 2017 Dep. 20))--or the estimated time for the round trip--five hours (*see* Moll 2006 Dep. 269). Dixon's minima meant that Moll was required to make at least three trips to Syracuse each week, thus demanding of her a minimum of an extra 15 hours of travel time a week, amounting to more than 60 hours a month. And given a round-trip distance of approximately 320 miles, Moll would have been driving nearly 1,000 miles a week, incurring the extra time--and expense--in driving more than 4,000 miles a month.

And these were the minima if Moll went to Syracuse on only three days. As Dixon had ordered that Moll be in Syracuse for half days if in the other half of the day she was required to be in Buffalo, that order in combination with the requirement of three eight-hour days in the Syracuse office meant that in any week in which Moll had a half-day

appointment in Buffalo she would be required to go to Syracuse on a fourth day--a five-hour round trip in order to spend four hours in the Syracuse office. The district court could not properly rule that these demands were, as a matter of law, "trivial," *Moll IV*, 2020 WL 5593845, at *16; *Moll II*, 2012 WL 1935087, at *29.

Nor did the fact that Moll did not often actually go to Syracuse mean that the Dixon order that she do so was, as a matter of law, not an adverse employment action. Whether the employee has resisted complying with the employer's decision is not the proper focus. The test of whether a decision is a materially adverse employment decision is whether its nature is such that it would likely, in the relevant context, dissuade a reasonable employee from complaining about discrimination. A rational juror could find, in the context presented here, that the prospect of being required to spend more than 60 extra hours driving a total of more than 4,000 extra miles every month, just to get to and from her job, "could well dissuade a reasonable" employee--who was a mother with young children and other responsibilities--"from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

The district court also ruled that Moll was not subjected to an adverse employment action on "[any] day from August 29, 2005, when placed on disability until she was reassigned to Buffalo in February 2006 and later returned from disability . . . (*despite the source of the disability*)." *Moll IV*, 2020 WL 5593845, at *18 (emphasis added). The court's

parenthetical evidently refers to Moll's assertion that the very source of her disability was the stress caused by the multifaceted sex discrimination to which she was subjected in ESG, including receiving less pay than males doing comparable work, being subjected to an environment that was hostile and demeaning to women, and--added to all of that--being vengefully required to commute to a city 160 miles away, with attendance conditions costing her, *inter alia*, more than 60 extra hours of driving per month.  However, even if Moll never consistently made the commute, the evidence presents a triable issue as to whether the 160-mile lateral transfer and the stringent attendance requirements were "harmful to the point that they could well dissuade a reasonable worker" with Moll's family responsibilities "from making or supporting a charge of discrimination," *Burlington Northern*, 548 U.S. at 57.

Finally, we note that the *Moll IV* court stated Moll had failed to show that the Syracuse transfer plan was linked to her discrimination complaints because, *inter alia*, the fact that Verizon's stringent requirements for SEs' presence in Syracuse were directed at "both [Moll] and Chase" made it "not clear that the transfer was retaliatory or directed to Plaintiff merely because of her gender." *Id*. at *19.  But that motivation need not be "clear" at the summary judgment stage; it need only be arguable. *Davis-Garett*, 921 F.3d at 45.  And the inquiry into motivation "'cannot be short-circuited by the mere fact'" that an employer sought "'immunity from Title VII liability by taking care to [mistreat] an occasional male worker, though his preferred targets were female,'" *Kaytor*, 609 F.3d at 549 (quoting *Brown*

- 51 -

*v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001)), or--as Gaglione put it--inflicting "collateral damage" on a noncomplaining employee while retaliating against one who complained of Title VII violations.

In sum, we conclude that the record, viewed in the light most favorable to Moll, with all permissible inferences and credibility assessments determined in her favor, reveals genuine issues as to all of the elements of Moll's claim that Verizon's decision to transfer her job site to Syracuse violated Title VII's prohibition against retaliation.

D. *The Claims of Discrimination and Retaliation in Termination*

On her return to Verizon's Buffalo office in March 2006, Moll began reporting to a new SE Manager, Mark Witte, a former employee of MCI. (*See* Moll Decl. ¶¶ 128-129.) At first, Moll felt that her job was progressing well with Witte as her supervisor. (*See id*. ¶ 130.) In April 2006, when Dixon and SE Greg Shelton were having trouble resolving issues with a project for Verizon's most lucrative client--M&T Bank--the CAM on the account asked Moll to assist. Moll was able to solve the problems. Witte's comments in her mid-year performance review stated that the CAM "for M&T [was] very pleased with [Moll's] performance" and that her "positive contribution on handling the M&T Bank account . . . opened the door for closing new business."

In September 2006, however, Witte told Moll that she would have to report more frequently to the Amherst office. As that was the office in which Dixon and Irving worked, Moll immediately began to cry and to suffer symptoms of stress and anxiety. (*See* Moll Decl. ¶ 130.) She told Witte about her pending lawsuit that alleged harassing, discriminatory, and retaliatory conduct by Dixon and/or Irving; she said she did not want to be in close physical proximity to them. (*See id*. ¶ 131.) Moll implored Witte to reconsider this move; he refused.

Moll also complained to Witte that, since she returned to work, Dixon--who had become Regional Sales Manager--had not assigned any CAMs to work with her as either a primary or backup SE on any client account. (*See id*. ¶ 132.) Moll believed that Dixon's decisions placed her at an extreme disadvantage compared to all the other SEs, who were male. (*See id*.)

Also in September 2006, around the time Witte required Moll to work in the same office as Dixon and Irving, he required her to add 10 new accounts to her portfolio "by the end of the year." (Moll. Decl. ¶ 133.) She had never before been required to solicit new accounts; that was a duty of the CAMs and not the SEs. (*See id*.; *see also* Gaglione 2011 Decl. ¶ 36 ("I was never given any instruction by my supervisor (who was also Mr. Witte's supervisor)" to require that my SEs "add ten new accounts"; "SEs were never expected to generate new accounts.").)

In early 2007, Verizon notified Witte that there would be a Companywide reduction in force (or "RIF") in which he would be required to eliminate one SE I position. (*See* Declaration of Mark Witte dated August 22, 2017 ("Witte Decl."), ¶ 15.) Witte testified that he was never given any criteria to apply in deciding whose position to eliminate; nor did he recall having received any documents from Verizon to prepare for the RIF. (*See* Deposition of Mark Witte, March 1, 2017 ("Witte Dep."), at 259.) In contrast, Gaglione, for the same RIF, had been instructed to use standard "objective criteria, including annual appraisals," to "rank and rate" his SEs. (Gaglione 2011 Decl. ¶ 37.)

At that time, Moll was the only female SE managed by Witte. The other SEs in her reporting structure were Shelton, Gregg Maragliano, Tom Elks, and Kyle McMinn. On February 9, 2007, Witte informed Moll of the RIF and told her that her employment was going to be terminated. (*See* Deposition of Cindy L. Moll, May 24, 2017 ("Moll 2017 Dep."), at 16-17; Moll Decl. ¶ 135.)

In the RIF, Verizon laid off approximately 156 employees nationwide, including Moll. Witte did not give Moll a reason why she was chosen for termination. (*See* Moll Decl. ¶ 136.) But "after the [RIF]," "Witte expressed to [Gaglione] that he was proud to be able to terminate Ms. Moll." (Gaglione 2011 Decl. ¶ 38.)

In her amended complaint, filed in 2008, Moll alleged, *inter alia*, that she possessed the requisite skills for her position, and that the termination of her employment

was based on sex discrimination in violation of Title VII, and retaliation for her complaints about such discrimination. In the ensuing discovery period, Witte testified that he had selected Moll "[b]ased on [his] objectives and what the business needed." (Witte Dep. 259.) In a declaration, he asserted that Moll lacked the skills to work with products integral to Verizon's business in the wake of the MCI merger, and that her "job performance and results trailed those of the other [SEs] in [his] group." (Witte Decl. ¶¶ 16-17.)

1. *The* Moll II *and* Moll IV *Rejections of the Termination Claims*

In *Moll II*, a May 30, 2012 Decision and Order, the district court dismissed Moll's Title VII claims that her termination was based on discrimination and/or retaliation. It stated that

> [t]o make out a *prima facie* case of discrimination, Plaintiff must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. . . . The burden Plaintiff carries at the *prima facie* stage of summary judgment is minimal.

*Moll II*, 2012 WL 1935087, at *17. The court noted that to present a prima facie case of Title VII retaliation,

> Plaintiff must show that (1) she was engaged in a protected activity, (2) Verizon was aware of her participation in this activity, (3) Verizon took an action against her that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity, and (4) there is a causal relationship between the protected

- 55 -

activity and the adverse action--that is, a retaliatory motive played a part in the action.

*Id*. at *18.  The court noted that, in the absence of direct evidence of retaliatory motivation, that motivation may be inferable where the adverse action occurs in close proximity after the protected activity.  *See id*.

As to Moll's discrimination claim, the district court stated in *Moll II* that "[w]ithin Mark Witte's group, Plaintiff was selected because her skill set was unsophisticated, largely focused on traditional telephone services, and her capabilities, job performance, and results trailed those of the other Sales Engineers in her group."  *Id*. at *15. The court also stated that even

[a]ssuming Plaintiff met her *de minim[i]s* burden, Verizon has provided a legitimate, non-discriminatory reason for her termination.  Further, according to Verizon, Plaintiff was selected for termination because [Witte] perceived her skill set to be the least sophisticated of those in her work group, and her capabilities and job performance trailed behind her peers.

*Id*. at *24.  The *Moll IV* court likewise saw in Verizon's RIF no evidence of gender discrimination.  It stated that

Verizon Business *globally laid off more men than women*.  [Moll]'s supervisor, Witte, first laid her off and *months later* (when further layoffs were required) *laid off a male worker*.  Witte selected those to be reduced in force *on his own criteria* and not on the advice of others. Witte said he selected [Moll] for layoff . . . because she was *not knowledgeable of MCI technologies* . . . .

*Moll IV*, 2020 WL 5593845, at *24 (emphases added).

As to Moll's claim that the termination of her employment was retaliatory, the *Moll II* court had found that Moll failed to show a prima facie case because she adduced no evidence of a causal relationship between her termination and her complaints of Title VII violations. "She does not provide any direct evidence of a causal relationship, and her termination took place three years after the commencement of her lawsuit and four years after her initial charge of discrimination with the EEOC, which is too long of a period of time to show temporal proximity." *Moll II*, 2012 WL 1935087, at *24. The court also found that although Moll contended that Verizon's proffered reasons were pretexts for unlawful retaliation, she had pointed to no admissible evidence other than her own affidavit--her own subjective belief--to show the adequacy of her skills and performance, which was insufficient to show pretext. *See id*. The court thus concluded that Verizon was entitled to summary judgment dismissing Moll's claim that her termination was retaliatory.

Following our *Moll III* remand, the district court in *Moll IV* noted that this Court had rejected the *Moll II* ruling that Moll failed to raise a genuine issue to be tried "*as to the pretextual nature of nondiscriminatory reasons for the reduction in force,*" *Moll IV*, 2020 WL 5593845, at *25 (citing *Moll III*, 760 F.3d at 204 (emphasis added)). However, the *Moll IV* court found that summary judgment dismissing both termination claims nevertheless remained warranted for lack of a prima facie case.

As to Moll's claim that her termination was discriminatory, the *Moll IV* court found that her evidence failed to show "circumstances" sufficient to "give rise to an inference of discrimination." 2020 WL 5593845, at *24. It found that in the RIF, Verizon "globally laid off more men than women"; and it found that "months later (when further layoffs were required) [Witte] laid off a male worker," Steve Medve. *Id*. These raw-number rationales are questionable.

As to the simplistic point that Verizon laid off more men than women, our attention has not been called to evidence showing that the number of women laid off by Verizon in the early 2007 RIF was not disproportionate to the percentage of women in its workforce. Indeed, the spreadsheet that Verizon produced in post-remand discovery--referred to by the district court in *Moll IV*--appears to relate only to the September 2007 RIF, not the early 2007 RIF in which Moll was fired; and that spreadsheet "has the names (save Medve's) redacted and no gender identification," 2020 WL 5593845, at *24. And the fact that Witte terminated a male SE (Medve) a few months after terminating Moll may be of no significance at all: Moll had been the only female SE Witte was managing, and neither Verizon nor the court points to evidence that there were any women left for Witte to eliminate.

As to the claim that her termination was retaliatory, the court found that Moll failed to show any evidence of a causal relationship between her complaints of gender

discrimination and her termination. *Moll IV*, 2020 WL 5593845, at \*24. It apparently credited both Witte's statement that he chose Moll to be terminated in the RIF because her expertise was in traditional voice communication, and Verizon's contention that any possible inference of retaliation was "belie[d]" by Witte's assigning Moll to the account of Verizon's most lucrative customer. *Id*.

For the reasons that follow, we conclude that the court in *Moll IV* did not adhere to the summary judgment principles that a court, in ruling on such a motion, is required to consider the record as a whole, is required to view that record in the light most favorable to the party against whom judgment as a matter of law is sought, and is required to disregard all evidence favorable to the moving party that a jury would be entitled to disbelieve.

2. *The Record Viewed in the Light Most Favorable to Moll*

When Witte informed Moll that she was being terminated, he gave her no explanation as to why she was selected for the RIF. In his deposition and declaration, Witte attributed his decision to "[his] objectives and what the business needed." (Witte Dep. 259; *see* Witte Decl. ¶ 16.) Witte asserted that Moll lacked the skill to work with products integral to Verizon's business in the wake of the MCI merger, and that her job performance trailed behind that of her peers. (*See* Witte Decl. ¶¶ 16-17.)

Moll in her declaration asserted that she in fact did possess many of the skills that Witte claims to have desired. (*See* Moll Decl. ¶ 138.) And Witte's assertions that she lacked those skills do not appear to be supported by either first-hand knowledge or anything he had learned from clients or anyone who had supervised Moll in the past. Witte conceded in his deposition that he did not know the "full extent" of Moll's training in pertinent product areas, and he was not sure that she lacked the expertise to work with supposedly relevant technologies. (Witte Dep. 260-61.) Witte had not attended any of Moll's customer presentations. (*See id*. at 238 (he "attended customer meetings on occasion," but when asked why he did not attend any of Moll's meetings he responded, "I just didn't attend any.").) Witte also never sat down with Moll to explore what she could or could not do (*see, e.g., id*. at 260-61; Moll Decl. ¶ 138); and he made no inquiries of her prior supervisors (*see, e.g.,* Gaglione 2011 Decl. ¶ 38 ("Mr. Witte, who had worked with Ms. Moll for less than one year, never sought any input from me regarding Ms. Moll's abilities, even though I had supervised her since 2003 until her transfer back to Buffalo from Syracuse. If he had sought my input, I would have given Ms. Moll a relatively high rating.").)

Nor could Witte point to any document on which he had relied in making his decision. (*See, e.g.,* Witte Dep. 296.) The sole document he produced, a "Personnel Grading Sheet" comparing SEs, ranked Moll the lowest, giving her a "B minus" in "team" and in "relationships"--neither of which he could explain. As to "team," Witte conceded that in the

April 2006 M&T project (a "giant telephony mess" (*id*. at 314)), "Moll was doing all this work helping others when she didn't even have a . . . corporate account manager assigned to her, she would have been . . . doing more of a team effort because she[ was] helping everybody," and that is "what a team player does" (*id*. at 248). And Witte conceded that he saw no problem in Moll's relationship with the M&T CAM Marquis--and that in the M&T project, Moll was helping "[Dixon] who doesn't even, quote, unquote, like her." (*Id*. at 248-49.) When asked, "[s]o why would she get a B minus in relationships," Witte said "*I don't know why I scored it that way*," and "*I can't say it's accurate*." (*Id*. at 249-50 (emphases added).)

Two of the *Moll IV* court's findings--apparently accepting proffered reasons for rationalizing Witte's treatment of Moll--appear to be at odds with each other; and each seems to us, in light of the record as a whole, to raise more questions than it answers. First, the court appears to have credited Witte's "state[ment] that he eliminated [Moll's] position because her skills focused on traditional telephone services rather than the next-generation MCI products and services." *Moll IV*, 2020 WL 5593845, at *24 (internal quotation marks omitted). Second, the court found that "*Witte had assigned Plaintiff to the prestigious and highest revenue M&T Bank account*," stating that "[h]ad there been retaliation, Witte would not have assigned [Moll] to Verizon's most valuable account." *Id*. (emphasis added). We address first the assignment finding, which presents a procedural conundrum. We conclude that the truth of the matter concerning Moll's assignment to the M&T Bank account is a genuine issue

- 61 -

to be resolved by the jury.  So, too, is the significance of that fact in determining Verizon's reasons for terminating Moll's employment.

a. *Whether Moll Was Assigned to the M&T Account*

The court's acceptance of Verizon's contention is reflected in its conclusion that Moll "has not established any direct evidence of a causal relationship" between her termination and her complaints of discrimination or retaliation, because "*[h]ad there been retaliation, Witte would not have assigned Plaintiff to Verizon's most valuable account*."  *Moll IV*, 2020 WL 5593845, at *24 (emphasis added).  Verizon's assignment contention was advanced in its Statement of Material Facts submitted in support of its motion for summary judgment, as follows:

> 248.  Ms. Moll admits that Mr. Witte assigned Ms. Moll to "one of the highest revenue and prestigious accounts in the office" while she reported to him.  *See* Second Am. Compl. ¶¶ 85-87 (Tab 9).

The citation and quotation are accurate.  In the second amended complaint (or "SAC"), Moll alleged, *inter alia*, that after she provided services to M&T Bank ("M&T") in April 2006, Moll was informed that M&T was "so pleased" with her work that it "requested that she be assigned on a full-time basis to the account," and "[u]pon information and belief" the CAM on the M&T account "conveyed that information to Plaintiff's manager, Mark Witte."  (SAC ¶ 86.)  The SAC then alleged as follows:

87. Thereafter, *Plaintiff was assigned full-time to the M&T Bank account*.

(*Id*. ¶ 87 (emphasis added).)

In the ensuing discovery and motion practice proceedings, however, Moll argued that in April 2006 she was not assigned to the M&T account by Witte; rather, she asserted that she had been drafted into service by Dennis Marquis, the CAM for M&T, for a particular M&T project, on which issues had arisen that SE Shelton (who was assigned to the account) and Dixon had been unable to resolve. Moll was able to solve those problems. She also asserts that she was not, after her return from disability leave, assigned to any CAM. She contends that her allegations of retaliatory animus find support in the fact that she was thus underutilized, and the fact, admitted in the 2017 deposition of Witte, that she was not thereafter assigned full time to the M&T account despite M&T's request. (*See, e.g.*, Moll Decl. ¶ 137; Witte Dep. 312-14.)

Verizon contends that the court's finding that Moll was in fact assigned to the M&T account was required because the allegation in Moll's SAC that she was so assigned constitutes a judicial admission by which Moll is bound throughout the course of the proceeding. Verizon argues that Moll is not entitled to claim or attempt to prove that she was not in fact assigned to the M&T account.

Ordinarily, we would agree. It is established that a party's assertion of fact in a pleading is a judicial admission by which she normally is bound throughout the course of

the proceeding. *See, e.g., Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*, 757 F.2d 523, 528 (2d Cir. 1985). An allegation made only in a pleading that has been withdrawn or superseded is not a judicial admission, although it would, if offered against the pleader, qualify as a party admission within the meaning of Rule 801(d)(2) of the Federal Rules of Evidence. *See, e.g., United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991).

But a defendant's answer to a complaint is also a pleading. The Federal Rules of Civil Procedure detail the several ways in which a defendant can properly admit or deny all or parts of a complaint's allegations, *see* Fed. R. Civ. P. 8(b)(1)-(6); the theory behind these specifications "is that a defendant's pleading should apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial *and those that are contested and will require proof*," 5 Wright & Miller, *Federal Practice and Procedure* § 1261 (2021) (emphasis added). Thus, "[a] party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest." Fed. R. Civ. P. 8(b)(4).

In this case Verizon, in its answer to the allegations in SAC ¶¶ 86 and 87, stated as follows:

86. Defendant admits that Plaintiff was supporting the M&T Bank Account during April 2006. *Defendant denies the remaining allegations set forth in Paragraph 86 of the Second Amended Complaint*.

87. *Defendant denies the allegations contained in Paragraph 87 of the Second Amended Complaint*.

(Verizon Answer to Moll's Second Amended Complaint ("Verizon Answer") ¶¶ 86-87 (emphases added).) Therefore, according to Verizon's answer to SAC ¶ 87, after Moll provided services to M&T in April 2006, she was *not* "assigned full-time to the M&T Bank account." That too was a judicial admission, notwithstanding which, Verizon has proceeded to argue--in, and in support of, its motion for summary judgment--that Witte did in fact assign Moll to the M&T account.

Obviously, if the issue of whether Moll was or was not assigned full time to the M&T account as M&T requested is material to the adjudication of any of her claims, the normal rule that a fact advanced by a party in his pleading is conclusive against that party cannot be applied in this case. No rational judgment can be based on the proposition that a given fact simultaneously both did and did not exist. The solution here lies in the principles that the court has discretion to "avoid the consequence of conclusiveness of an admission," 9 Wigmore, *Evidence* § 2590 (2023), and that "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e).

We note that Moll's pleading--alleging that after she was called in to fix the M&T problem, a "giant telephony mess" (Witte Dep. 314) that had baffled Dixon and Shelton, she was assigned to the M&T account full time--was filed nearly two years before she obtained discovery from Witte. The Verizon Answer was also filed nearly two years before Witte gave his deposition; but Verizon presumably had knowledge as to whether or

not its agent had assigned Moll to its most lucrative customer, without taking his deposition. And we think it noteworthy that in its Statement of Material Facts in support of summary judgment, by which time Witte's deposition had been taken, the only citation Verizon provided to support its assertion that Witte did assign Moll to the M&T account after her April 2006 positive contributions to the M&T project was the allegation in Moll's SAC. Verizon did not point to any of its own documents to show such an assignment. Nor did it cite Witte's deposition.

Witte, in his deposition, appears to admit key parts of Moll's contention as to M&T's request that Verizon assign her to its account full time; but he also appears to testify that he did not grant that request. He testified in part as follows:

> Q. . . . . *Is it normal for you to get a request from a client to have a specific SE on their account*, a large client back then, your first year? Is that normal? . . . . How many that year asked you for a specific SE?
>
> A. I don't think many made a distinction, *if any*.
>
> Q. Well, *you just told me M and T did*.
>
> A. *Right*.
>
> Q. And you were in jeopardy of losing the account and they asked for a person and you didn't grant it? *What did you tell [M&T's telecommunications director]*?
>
> A. *I don't think I told him anything directly*.
>
> Q. You just ignored him?

A. I think we had a relationship there where he knew what we were doing and what was going on.

Q. Did you respond to his request, yes or no?

A. *There was no--I don't believe there was any definitive yes other than she would work on the account. . . .*

Q. Let's go back to a question. Did a customer, a large customer ask you specifically? *Did Mr. Marquis ever tell you that . . . the telecommunications director to M and T Bank[] was so impressed with Miss Moll's work that he asked Mr. Marquis to have her permanently assigned to that account?*

A. *I believe he said that.*

Q. Okay. And then what, if anything, did you do?

A. Cindy was assigned to work on the account at that time.

Q. So she became the SE on the account, is that what you're telling me?

A. She became *an* SE that worked on the account. There's no--

. . . .

Q. So you decided . . . to disregard the request of one of the largest clients that you had, right, that you're trying to do a big deal with, you just ignored him?

. . . .

Is that what you're telling me, you ignored him?

A. I felt like he was getting enough support.

. . . .

Q. . . . . Did you do anything?

A. I didn't do anything with regard to what you're asking.

(Witte Dep. 311-14 (emphases added).)

Q. Do you usually not grant client requests?

A. If it can be accommodated, we try to.

Q. *Why didn't you do it for her?* . . . . *What was the business reason not to do that*?

A. I'm not sure. . . . I don't understand your question.

(*Id*. at 311 (emphases added).)

If, as Moll asserts, she was at that time not assigned to any CAM and could have been assigned full time to M&T as it requested, a rational juror could find it difficult to discern a legitimate business rationale for Witte's denial of M&T's request. It is even more difficult for us to conclude that justice would be done in this case by allowing either party, having pleaded a given fact presumably in good faith, to preclude the other side from adopting that factual proposition.

Accordingly, in this case, in which each side has retreated from its factual pleading to endorse the opposite proposition, we think it appropriate that neither pleading should be viewed as conclusive against the pleader; rather, as a matter of judicial discretion, each is deemed to have been superseded. But each pleaded assertion may be treated as a

party admission for evidentiary purposes. The truth of the matter remains a genuine issue of fact to be determined by the jury.

b. *Witte's Stated Reason for Moll's RIF Termination*

The specific reason advanced by Witte for selecting Moll to be terminated in the RIF--that Moll's specialty was traditional voice communication--also seems puzzling. M&T was Verizon's most lucrative customer, and "a large piece of the business" that Verizon did with M&T was "traditional" voice communication (Witte Dep. 240). In the Spring of 2006, Moll had been able to solve M&T's problem; and M&T had been so pleased that it asked Verizon to assign Moll to its account permanently.

A rational juror could well infer that the fact that Moll's main expertise was voice communication--given the fact that she had been the only one able to clear the obstacles to the M&T project--was not the real reason she was chosen for termination. M&T's request for Moll's full-time assignment meant that her expertise was a valuable commodity. Asked about the import of his evaluation of Moll in September 2006, just a few months before announcing that she would be terminated, Witte testified as follows:

> Q. . . . [W]here you said that her positive contribution on handling the M and T Bank account has opened the door for closing new business. What does that mean, open the door for closing new business?
>
> A. That means it creates a positive business relationship.

Q. More money to come in the door, right?

A. Yes.

(*Id*. at 237.)  A rational juror could look for and, importantly, could find in other evidence an explanation that supports Moll's claims of discriminatory or retaliatory motivation.

c. *Witte's Choice To Terminate Moll Rather Than Shelton*

At the summary judgment stage, a plaintiff can meet the "minimal" burden to show circumstances sufficient to raise an inference of discrimination by showing that her employer "treated [her] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 38-39 (2d Cir. 2000).  Whether that person is "similarly situated" is a fact question normally left to the jury.  *Id*.  Here, Moll raised such a triable issue of fact by pointing to Greg Shelton, her male coworker with apparently similar qualifications who was not let go in the RIF.  According to Moll's testimony, both she and Shelton shared the same skillset of traditional voice, long distance, and telephone services.  (*See* Moll Decl. ¶ 137; Moll 2017 Dep. 117-18.)  And at his deposition Witte was unable to explain how Shelton was better qualified--or differently situated--than Moll.

When Witte was asked what Shelton was "most knowledgeable of," Witte began by talking about Shelton's "ILEC background" before Moll's counsel quickly pointed out that Witte had already said Moll was most knowledgeable about ILEC.  (Witte Dep. 272)

- 70 -

After Witte was again pressed to specify Shelton's best attribute, Witte provided only vague responses. He first stated, without elaboration, that Shelton was "a mix of all services." *Id*. Witte then pivoted to talking about various other areas--like "the data side and the IP and the VPN structures," in which Moll was not "strong"--but without saying that Shelton was proficient there either. *Id*.

In contrast, there was specific evidence from which a jury could reasonably infer that Shelton was not better qualified than Moll--to wit, the events concerning Verizon key client M&T's "giant telephony mess" (Witte Dep. 314). The "mess" involved problems on which Shelton had been working and had been unable to solve. Moll was called in to address the problems, and she solved them. Thus, while Witte asserted that he selected Moll for termination in the RIF because "her capabilities, job performance and results trailed those of the other sales engineers in [Witte's] group" (Witte Decl. ¶¶ 16-17), the record contains concrete evidence that Moll had been able to solve problems for an important client that were beyond Shelton's capability.

Indeed, following her success, M&T asked Verizon to assign Moll to the M&T account full time. Witte was asked, "How about Mr. Shelton, did [the M&T telecommunications director] say he wanted Mr. Shelton to be the one on his account?" Witte said, "I don't think so." (Witte Dep. 315.) Yet Witte declined to assign Moll to the M&T account as it requested; and he designated Moll for termination while Shelton was retained.

A jury could reasonably find that Witte's claim that Shelton's skills were more valuable to Verizon than Moll's was not credible, and, in light of other testimony by Witte, that Moll's termination was retaliation for her complaints of sex discrimination.

d. *Witte and Dixon*

As described in Part II.C. above, the record contains evidence that Dixon had devised the plan to send the Buffalo-based SEs to Syracuse in an effort to retaliate against Moll and Byrne for complaining of Title VII violations; and he expected that the relocation, and his "adamant" requirements that Moll be physically present in Syracuse most days of the week some 160 miles from her home, would cause her to leave ESG or Verizon. When SE Manager Witte made his decision not to assign Moll to the M&T account, and proceeded to select Moll as the SE whose job would be eliminated in the RIF, Dixon was his Regional Sales Manager. Witte testified that his own job as manager of SEs was, "[i]n some ways," to "deal with Mr. Dixon and *keep Mr. Dixon happy*." (Witte Dep. 267 (emphasis added).) Witte said he could "try to do things differently," but Dixon "play[ed] a role in how things g[o]t done." (*Id*.)

Witte knew that Moll had a pending lawsuit that involved claims of misconduct by Dixon. And although Witte said he could not recall whether he and Dixon had discussed Moll's suit, he testified that he "*sens[ed] the animosity*" "*from Mr. Dixon to Miss*

*Moll*." (Witte Dep. 233, 234-35 (emphases added).) As to whether Dixon wanted him to choose Moll as the person to be terminated in the RIF, Witte testified as follows:

Q. Anyone ever tell you Mr. Dixon wanted Miss Moll gone?

A. Not gone. *Not those terms*. I just was aware of the lawsuits.

(*Id*. at 299 (emphasis added).)

Whatever "terms" Witte may have heard from Dixon, there is clear evidence that Dixon in fact wanted Moll "gone" because of "the lawsuits," as set out in the declarations and deposition testimony of Gaglione described in Part II.C. above. For example, in his 2011 declaration--quoted more extensively in Part II.C.2.--Gaglione described attending meetings in which "Mr. Dixon proposed" the transfer of the Buffalo SEs to Syracuse, 160 miles away, "primar[il]y . . . []as an effort to retaliate against both *Ms. Moll* and Ms. Byrne *for their continuing complaints of discrimination and retaliation*." (Gaglione 2011 Decl. ¶¶ 13-14 (emphases added).) Gaglione stated, *inter alia*, that "*Mr. Dixon* and Mr. VanHoesen *wanted to make life as difficult as possible for Ms. Moll* and Ms. Byrne" (*id*. ¶ 14 (emphases added)) they knew of Moll's "ties to the Buffalo area" (*id*. ¶ 15); they "all knew [Moll] would not move to Syracuse" (Gaglione 2017 Dep. 76); and "*Mr. Dixon* and Mr. VanHoesen . . . *stated that they believed this action would force [Moll] to leave ESG*" (Gaglione 2011 Decl. ¶ 14 (emphases added)). Thereafter, to further increase the pressure on Moll, Dixon required Gaglione to order her to "be at [her] desk in Syracuse [for] a minimum of . . . 3 days per week, 8 hours

a day" (Moll Decl. ¶ 118), a requirement imposed on "[n]o other SE" (Gaglione 2011 Decl. ¶ 30). In addition, whenever Moll had a morning or afternoon meeting with a client in Buffalo, she was required to be in the Syracuse office for the other half of the day.

Moll did not leave ESG; after Dixon's efforts "to make [her] life as difficult as possible," Moll took a disability leave of absence for stress. When Moll returned from that leave--to work at ESG in Buffalo, because during her leave, Verizon had retransferred its Buffalo SEs to Buffalo--her manager was Witte. Gaglione described Witte's treatment of Moll as disregarding her abilities, instructing her to generate new customers (a responsibility that SEs had never been given before), imposing on her performance targets that were unrealistic, and terminating her without ever seeking an evaluation of her work from Gaglione, who had supervised her since 2003 and would have given her a relatively high rating. (Gaglione 2011 Decl. ¶¶ 36, 38.)

While the district court concluded that Moll's termination could not be attributed to Title VII-prohibited retaliation because it "occurr[ed] three years after [the 2004] commencement of this action," *Moll IV*, 2020 WL 5593845, at *24, that conclusion ignored evidence that could support a finding of causation. Based on the record as a whole, a jury could reasonably find that Verizon managers had engaged in a years-long campaign of retaliation against Moll that culminated in Witte's decision to designate her for termination in the RIF. Moll filed the present action in October 2004. Dixon's plan to have Moll and the

- 74 -

other Buffalo SEs transferred to Syracuse in order to retaliate against Moll and Byrne was proposed and launched in "late 2004" (Gaglione 2011 Decl. ¶¶ 13-14).

Although Witte had come to Verizon in the 2005 MCI merger, and hence had not been involved in Dixon's earlier efforts to drive Moll from ESG, he became aware of Moll's lawsuit in September 2006 (*see, e.g.*, Witte Dep. 218 (shortly after giving Moll a glowing review on September 13, 2006, Witte had a meeting with her in which she told him about her lawsuit, and he "was probably made aware of stuff at that point")). Witte testified that he "was aware of the lawsuit at the end" of "September-ish" (*id*. at 233) and after learning of the lawsuit, he "sens[ed]" Dixon's "animosity" toward Moll (*id*. at 234-35).

Witte knew that Dixon "d[id]n't . . . like Moll" (Witte Dep. 248-49); he testified that he believed that part of his job at Verizon was to "keep . . . Dixon happy" (*id*. at 267); and after the RIF, Witte said he was "proud" to have terminated Moll (Gaglione 2011 Decl. ¶ 38).

Although Witte denied having expressed such pride (*see* Witte Dep. 235), a jury need not find his denial credible. With respect to Verizon's motion for summary judgment, therefore, the court was required to disregard that denial.

In sum, in addition to the lack of any apparent business reason for terminating Moll instead of granting the request of Verizon's most lucrative customer that she be assigned to its account full time, the admissible evidence in this case, taken in the light most favorable to Moll, includes

‣ Witte's statement that Verizon gave him no objective criteria by which to decide which SE to terminate,

‣ Witte's selection of Moll for the RIF termination with apparent disregard for the glowing midyear review he had given her less than six months earlier,

‣ Witte's claim to have based his decision on Moll's lack of relevant skills,

‣ Witte's claim to have believed that Moll lacked relevant skills, despite his having made no attempt to determine what skills she had by observing her in action, or by interviewing her, or by inquiring of her prior managers, and

‣ Witte's claim to have viewed Moll's skills as lacking relevance despite the fact that her product specialty was "a large piece of the business" that Verizon conducted with its highest revenue client--and in spite of the client's express request for her full-time services, which would have meant "[m]ore money to come in the door."

A rational factfinder attempting to identify a more plausible reason for Witte's decision to

terminate Moll would also be entitled to take into account the evidence that

‣ Witte knew of Dixon's animosity toward Moll,

‣ as witnessed by Gaglione, there had been a pattern of adverse employment decisions by Moll's managers, designed to cause her to leave ESG, in retaliation for her complaints of sex discrimination and retaliation,

‣ Dixon himself had orchestrated the failed 2004-2005 attempts to rid ESG or Verizon of Moll by transferring her job site to Syracuse and imposing the onerous attendance requirements,

‣ Witte's view was that part of his job was to "keep . . . Dixon happy," and

▸ Witte, after the RIF, stated that he was "proud" of having terminated Moll.

We conclude that the record was sufficient to show circumstances from which a rational juror could infer that the termination of Moll's employment was motivated by gender discrimination or by retaliation for her complaints of such discrimination.

E. *The Unequal Pay Claims*

Moll's claims of unequal pay focused on the comparison between her Verizon salary and the salaries Verizon paid to three males who were SEs during parts of her tenure as an SE. Thomas Spencer, who had previously been employed in a different Verizon division, joined the enterprise solutions group in 1997 shortly before Moll; he joined as a Senior Systems Analyst, the position that would be retitled SE II. David Winley and Kevin Dean were hired for the group in the Spring of 2002 from outside of Verizon; originally called "Senior Specialists--Technology Solutions," their titles were soon changed to SE IV. All four of these sales engineers were supervised by SE Manager Irving through 2002; Irving was succeeded by Gaglione.

When Moll was promoted to sales engineer in 1997, her SE I base salary was $47,400. Spencer's base salary as an SE II had been set at $61,300. By 2002, Moll's base salary was $54,400, and Spencer's was $72,800. And in that year, Dean was hired at a base salary of $88,000, and Winley was hired at a base salary of $90,000. Throughout the periods in

which Winley, Dean, or Spencer overlapped with Moll at ESG, their compensation, after raises for all, was higher than Moll's by at least $13,900 to $35,600. Moll claimed that Verizon's paying her less than it paid Winley, Dean, or Spencer, when all of them performed substantially similar work, violated the EPA and Title VII.

Verizon moved for summary judgment dismissing these claims "whether asserted under the Equal Pay Act or otherwise," arguing that Moll "cannot demonstrate that she performed equal work on jobs requiring equal skill, effort, and responsibility in comparison to males and, in all events, Verizon can point to gender-neutral reasons for any purported pay disparity." (Verizon Notice of Motion for Summary Judgment at 2 (internal quotation marks omitted).) It contended principally that its employment of Winley, Dean, and Spencer at salaries higher than it paid Moll did not violate the Equal Pay Act because those men had key skills that differed from Moll's, or because Verizon could not hire them without meeting their respective monetary demands.

The district court, without mentioning Title VII, granted summary judgment dismissing the claims of unequal pay. It found that, although Moll presented sufficient evidence to establish a prima facie case of EPA violation, Verizon had established that the salary disparities were based on factors other than sex. *See Moll IV*, 2020 WL 5593845, at *25. Moll challenges this conclusion.

Moll also contends that the court erred in failing to address her claims that the disparities between her salary and those of Winley, Dean, and Spencer violated Title VII. Verizon argues that the district court correctly dismissed the EPA claims; and it contends that Moll has waived her claims of unequal pay violations of Title VII because she did not present any argument for those claims in opposition to the motion for summary judgment (*see* Verizon brief on appeal at 54).

"[W]hen a counseled party moves for summary judgment, a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (internal quotation marks omitted) (finding hostile-work-environment claims abandoned because the non-movant filed a brief that "failed to support or even address" those claims). In response to Verizon's motion for summary judgment, Moll's memorandum defending her claims based on unequal pay discussed only the EPA, not Title VII. (*See* Moll Memorandum of Law in Opposition to Verizon's Motion for Summary Judgment at 34-35.) And in her reply brief to this Court, while Moll argues that her claims that the unequal pay violated Title VII were asserted in her complaint (*see* Moll reply brief on appeal at 25-26 (citing sections of the district court record containing parts of the second amended complaint)), she does not point to any part of her memorandum to the district court in opposition to summary judgment

that argued for preservation of her claims that the lower salaries Verizon paid her violated Title VII.

In light of Moll's submissions, we agree with Verizon that, as Moll failed to argue in the district court against summary judgment dismissing her claims that the unequal pay violated Title VII, she abandoned those claims and cannot now resurrect them on appeal.

With respect to Moll's claims under the EPA, we see no error in their dismissal to the extent that Moll's proposed comparators were Winley and Dean. We see issues to be tried, however, with respect to Moll's equal pay claim to the extent that it compared her salary to Spencer's.

1. *The EPA*

The Equal Pay Act, designed "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work," *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) ("*Belfi*"), provides, in pertinent part, that "[n]o employer" engaged in interstate or foreign commerce

> shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, *except*

*where such payment is made pursuant to . . . (iv) a differential based on any other factor other than sex.*

29 U.S.C. § 206(d)(1) (emphases added). To establish a prima facie case of discrimination under this section, the plaintiff must show that

> "[1] the employer pays different wages to employees of the opposite sex; [2] the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and [3] the jobs are performed under similar working conditions."

*Belfi*, 191 F.3d at 135 (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995) ("*Tomka*"), *abrogated on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)); *see, e.g., Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). "The Equal Pay Act creates a type of strict liability," because "no intent to discriminate need be shown. . . . [A] *prima facie* showing gives rise to a presumption of discrimination." *Belfi*, 191 F.3d at 136 (internal quotation marks omitted); *see, e.g., Ryduchowski v. The Port Authority of New York & New Jersey*, 203 F.3d 135, 142 (2d Cir.) ("*Ryduchowski*") ("the EPA does not require a plaintiff to establish an employer's discriminatory intent"), *cert. denied*, 530 U.S. 1276 (2000).

Once a plaintiff makes out a prima facie case, however, the employer has available several statutory affirmative defenses--including the defense advanced by Verizon, that the complained-of differential in pay was "based on" a "factor other than sex," 29 U.S.C. § 206(d)(1)(iv). The burden of persuasion as to the proffered defense is on the employer. *See Tomka*, 66 F.3d at 1310. And the employer must prove that the asserted factor is "related" to

the performance of the job in question. *Aldrich v. Randolph Central School District*, 963 F.2d 520, 527 (2d Cir.) ("*Aldrich*"), *cert. denied*, 506 U.S. 965 (1992). For example, "[w]hile [a male's] *experience* may very well explain the [pay] discrepancy, [the employer] has the burden of persuasion to show both that it based [the male's] higher salary on this factor and that *[his] experience is a job-related qualification*." *Tomka*, 66 F.3d at 1312 (emphases added). Without this "job-relatedness requirement," the "factor-other-than-sex defense would provide a gaping loophole in the [EPA]" through which many post hoc excuses for discrimination "would be sanctioned." *Aldrich*, 963 F.2d at 525.

Finally, "[o]nce the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'" *Ryduchowski*, 203 F.3d at 142 (quoting *Belfi*, 191 F.3d at 136); *see, e.g.*, *Aldrich*, 963 F.2d at 526.

2. *Moll's Claimed Comparators*

Application of the above principles here leads us to a potentially different outcome for Moll's EPA claim with respect to Spencer than with respect to Winley and Dean.

- 82 -

### a. *Winley and Dean*

There is no question as to the circumstances that led to Verizon's hiring of Winley and Dean. In mid-2000, Verizon merged with telecommunications provider GTE, which added new products that Verizon could offer, especially to corporate customers. These included voice and data "customer premises equipment" (or "CPE"). In order to market these products, Verizon needed personnel who had expertise in the newly acquired technologies. At that time, Moll "didn't have any experience" in "selling voice and data CPE products." (Moll 2006 Dep. 69.)

In early 2002, Verizon advertised two Buffalo-based job openings listed as "Senior Specialist--Technology Solutions," one to focus on voice CPE and the other on data CPE. The job descriptions called for, *inter alia*, a "Bachelor's degree or equivalent experience," "technical knowledge," and--labeled "Highly Desired"--"[e]xperience in engineering and selling voice, data and IP services in the enterprise market," and "[e]xperience in value selling of customer premise equipment for voice switching, designing and selling Nortel Enterprise Voice Switching products." (Verizon job posting dated January 22, 2002; *see* Byrne Aff. ¶ 27.) In order to entice the desired individuals to leave companies that were more entrenched in these products, Verizon typically offered a base salary of $90,000. The salary range listed in these postings was $54,000-$132,000.

In the Spring of 2002, Verizon hired Winley and Dean, both of whom had previously worked for Nortel. Winley was hired for the voice CPE position, at a base salary of $90,000. Verizon hired Dean for the data CPE position; his base pay in 2002 was $88,000.

Both Winley and Dean were SE IVs. But mere titles have little sway in EPA analysis. *See, e.g., Tomka*, 66 F.3d at 1310. And here, Gaglione stated that the ESG "numerical designations" SE I to SE IV "were meant to signify a distinction in technical expertise within certain assigned product specialties," but that

> these designations meant little in practice because some product specialties did not require a depth of technical knowledge. *All of the SE's were expected to be able to assist CAM's in designing telecommunications systems for customers and prospective customers*.

(Gaglione 2011 Decl. ¶ 11 (emphasis added).) However, while "there was no distinction" among Winley, Spencer, and Moll (*id*.) and Dean (*see* Gaglione 2017 Dep. 67-68) as to "the[ir] *level* of skills, effort and responsibility," some SEs "had *greater knowledge of particular products*, such as data systems, or voice systems, or telephonic systems, . . . *based in part on subject areas* that [Verizon] asked each to concentrate on" (Gaglione 2011 Decl. ¶ 11 (emphases added)).

Thus, as Moll described the work of the sales engineers in 2002, it was "segmented by product":

> [Moll] was responsible for the "specialty bucket" consisting of core voice (or local usage) products, Ms. Byrne was responsible for optical services products, Mr. Spencer was responsible for fast packet (data services), Mr. Winley was responsible for voice CPE and Mr. Dean was responsible for data CPE.

(Moll Counterstatement of Facts ¶ 106.) Accordingly, given the different levels of knowledge in relation to particular products, Gaglione testified that there were "things that . . . Kevin Dean[] was appropriate to be assigned to that, say, Tom Spencer would not have been appropriate to assign [to]" because

> Dean was very knowledgeable in the area of TCPIP internet working, and Tom Spencer was not. So if something was related to, you know, that protocol stack, . . . I wouldn't assign Tom to it, but it wouldn't mean that Tom's not a great SE, you know? But he's just--his area of expertise falls in other areas like voice, traditional . . . . telephony.

(Gaglione 2017 Dep. 68.) And for the same reasons, there were projects "that [Gaglione] would assign Kevin Dean to that [he] would not have assigned Cindy Moll to." (*Id*. at 69.)

In light of Verizon's acquisition of CPE voice and data products in its merger with GTE, its need for staff experienced in those new products, and Moll's admission that she had no experience in selling voice and data CPE products, no rational juror could infer that Verizon, in hiring Winley or Dean to sell those products, paid them more than Moll based on gender.

As it turned out, neither Winley nor Dean remained at Verizon long. Winley's performance was widely criticized, and he had difficulty meeting his Verizon sales objectives. (*See*, *e.g.*, Deposition of Christopher T. Gaglione, November 29, 2005 ("Gaglione 2005 Dep."), at 32-40, 213 (Gaglione "talked with Winley . . . on . . . five or six occasions, regarding his perceived lack of performance and [his increasingly] . . . obvious lack of . . .

capabilities").) Winley soon accepted Gaglione's recommendation that he agree to a Verizon buyout plan; Winley left Verizon in late 2003. (*See id*. at 221.) Dean, who also was not meeting his Verizon sales objectives, voluntarily left Verizon in May 2004 and returned to Nortel. (*See*, *e.g.*, Moll Counterstatement of Facts ¶¶ 72, 173.)

Moll emphasizes the deficient performances of Winley and Dean--in the work they were hired for--in her attempt to show that all four of the SEs performed substantially similar work and that she should not have been paid less than the men. With the benefit of hindsight, these two men perhaps should not have been hired. But the fact that they did not live up to Verizon's expectations as to their performance and/or capabilities is not evidence that the work for which they were hired was substantively comparable to that performed by Moll, or that Moll was qualified to perform it, or that Verizon paid them more than Moll because of gender. We see no error in the district court's rejection of Moll's EPA claim insofar as her comparators were Winley and Dean.

b. *Spencer*

We find the record less clear with respect to Moll's EPA claim as to proposed comparator Spencer. Spencer differed from Winley and Dean in a number of ways. He joined ESG at the SE II level in 1997, prior to Moll's promotion to the SE I level in that year. Spencer remained an SE II until he left ESG in early 2004 to work in another area of Verizon.

As indicated in the previous section, Gaglione testified that Spencer did not have the CPE capabilities that Verizon believed Winley and Dean possessed; Gaglione could not give Spencer the same projects that would be given to Winley or Dean.

Nor was Spencer in 1997 someone Verizon had to hire away from another company; he was already a Verizon employee. He had spent the prior 10 years as a "market administrator" in a different Verizon department (Deposition of Thomas Spencer, December 21, 2005 ("Spencer 2005 Dep."), at 14). Just prior to his being hired for ESG, his salary was $58,800, and he stated that he informed then-SE Manager McGowan that he would not move to ESG unless he received a raise (*see* Declaration of Thomas Spencer dated June 29, 2006 ("Spencer Decl."), ¶ 5). He was given about a 4.3% raise of $2,500 and was thus paid $61,300 to be an SE II; Moll's base salary as an SE I that year was $47,400. When Spencer left ESG in 2004, his base salary was $76,200. By then Moll too was an SE II; but her base salary was $59,400--*i.e.*, less than Spencer's when he began in 1997.

Verizon points out that Moll was promoted to SE I from a clerical position, and it contends that the salary it paid Spencer was justifiably higher than the salary it was to pay Moll because Spencer was a "long-time Verizon manager" in a different division, referred to as "COG Group." (Verizon Statement of Material Facts ¶ 13; *see also* (Verizon brief on appeal at 60) (stating that Spencer "had a decade of management work").) While the record shows that Spencer's salary in COG was already well above what Moll's would be as an SE I,

we are not persuaded that the record as a whole supports Verizon's contention that Spencer was not a valid comparator for Moll's equal pay claim as a matter of law.

First, Spencer's own testimony in his 2005 deposition appears to contradict Verizon's characterization of his COG job as that of a "manager." Although the title was "Market Administrator"--and Spencer in his declaration referred to it as "my former management job" (Spencer Decl. ¶ 4)--he testified that his job was to provide Verizon salesmen with "technical support" (Spencer 2005 Dep. 14). He said, "[t]hey would come to me for questions or problems." (*Id*. at 15.) But Spencer testified that no one reported directly to him; and he was not aware of any organization chart in which he would be listed above other individuals. He testified that he was not authorized to hire, or fire, or evaluate, or promote anyone. He was not authorized to, and did not perform, employee performance reviews. Those appraisals were done by Spencer's own supervisor; and while Spencer could make recommendations, he did not recall ever being asked for his views. (*See id*. at 15-16.)

Nothing in the record materials supplied on this appeal appears to support the view that Spencer was hired away from a job in which he had management duties. Indeed, Spencer viewed the SE II job--which itself was supportive of the CAMs, rather than managerial--as "a promotion" (Spencer Decl. ¶ 6).

It is less clear whether Spencer's work as an SE II was substantially comparable to the work performed by Moll. Moll claims that the work of all the SEs was comparable,

but she described her main area of expertise as traditional voice communication, while describing Spencer's as "fast packet" "data services," explained as "[f]rame relay services, data services" (Moll 2006 Dep. 145). However, Gaglione, in distinguishing Spencer's data specialty from the specialties of Winley and Dean, testified that Spencer's "area of expertise" included "areas like voice, traditional . . . . telephony" (Gaglione 2017 Dep. 68), the area that was Moll's specialty.

Spencer himself has shed no direct light on his comparability to Moll. The Spencer declaration in the present record was one that he furnished in the action brought by Byrne; and it indicates that Spencer's specialties were never the same as Byrne's. (*See* Spencer Decl. ¶¶ 8-9.) But Spencer did not mention Moll either in that declaration or in his 2005 deposition; and so far as we are aware, he has not furnished any declaration in the present action. While Spencer gave a deposition in this case, the only excerpts included in the record on appeal describe his testimony about hearing--and telling the people seated near him about--Finnegan's Verizon fax number, which Spencer considered "minor compared to other things that were always said every day" (Deposition of Thomas Spencer, November 21, 2006, at 24). We have not been pointed to evidence indicating that Spencer did not have the same voice telephony specialty as Moll.

Moreover, even if Spencer's previous experience could explain the difference between his and Moll's salaries in 1997 when their employment in ESG began, that factor

would not explain why the salary gap persisted. Differences in education and experience at the time of hiring are likely to matter less as the employees spend years on the job, leading to less of a disparity between salaries. *See generally King v. Acosta Sales & Marketing, Inc.*, 678 F.3d 470, 473-75 (7th Cir. 2012). That did not occur here. When Spencer left ESG in 2004 he was still an SE II, and Moll had been promoted to SE II. Yet, the difference between their salaries after both had been in ESG for those seven years had not shrunk but in fact had increased. In 1997, Spencer's salary exceeded Moll's by $13,900; in 2004, Spencer's salary exceeded Moll's by $16,800. Although Verizon argues that "no statutory or judicial authority" required it "to close any gap more quickly" (Verizon brief on appeal at 60), it has offered no reason "other than sex," 29 U.S.C. § 206(d)(1), for the persistence and growth of the Moll-Spencer pay gap.

In sum, especially given the evidence undermining Verizon's contention that Spencer had previously been a "manager," there are factual issues to be resolved as to whether Spencer was comparable to Moll for purposes of the Equal Pay Act.

F. *Moll's State-Law Claims*

After dismissing Moll's Title VII claims, the district court noted that her NYSHRL claims were governed by the same principles and dismissed them as well. To the

extent that we vacate the dismissal of the Title VII claims, we also vacate the dismissal of her parallel NYSHRL claims.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except as indicated above, have found them to be without merit. The judgment dismissing Moll's complaint is affirmed except to the extent that it dismissed her claims under Title VII and the NYSHRL for hostile work environment, retaliatory transfer of her job site to Syracuse, and discriminatory or retaliatory termination of her employment; we also vacate so much of the judgment as dismissed her Equal Pay Act claim insofar as it identified Spencer as a comparator. As to these specified claims, we vacate the judgment and remand for trial.

Costs to plaintiff.